[Cite as *State v. Rardon*, 2018-Ohio-1935.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, J. |
| -vs- | : | |
| | : | |
| BRENT RARDON | : | Case No. 17 CAA 04 0027 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Delaware County
Court of Common Pleas, Case No.
16CR-I-08-0409



JUDGMENT:     Affirmed



DATE OF JUDGMENT:     May 15, 2018



APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

CAROL HAMILTON O'BRIEN             CHARLES A. KOENIG
Prosecuting Attorney                    TODD A. LONG
                                        Koenig & Long, LLC
By: KIMBERLY E. BURROUGHS          5354 North High Street
Assistant Prosecuting Attorney      Columbus, Ohio 43214
Delaware Co. Prosecutor's Office
140 North Sandusky Street
Delaware, Ohio 43015

*Baldwin, J.*

{¶1}  Defendant-appellant Brent Rardon appeals his conviction and sentence from the Delaware County Court of Common Pleas on one count each of trafficking in drugs and possession of drugs. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}  On August 26, 2016, the Delaware County Grand Jury indicated appellant on two counts of trafficking in drugs in violation of R.C. 2925.03(A)(2), one (Count One) a felony of the second degree and one (Count Three) a felony of the fourth degree, and two counts of possession of drugs in violation of R.C. 2925.11(A), one (Count Two) a felony of the second degree and one (Count Four) a felony of the fourth degree.  The indictment covered the period from January 1, 2015 through September 9, 2015.  At his arraignment on November 18, 2016, appellant entered a plea of not guilty to the charges.

{¶3}  A jury trial commenced on February 28, 2017. The following testimony was adduced at trial.

{¶4}  Keven Liston, along with Wade Kirk, founded and is the co-owner of Supzilla Sport Nutrition, a health and wellness business which sells supplements, vitamins, protein powders and other health and wellness items. Supzilla has eleven retail stores throughout central Ohio and Indiana. In late 2013/early 2014, appellant, who was a personal trainer, purchased the Powell, Ohio location and operated that location in partnership with Liston and other Supzilla owners.

{¶5}  Liston testified that on September 3, 2015, he was contacted by Austin Pagani, who was working at the Powell store. Pagani sent Liston a picture stating that he did not feel comfortable selling what was in the picture. Liston then went immediately to

the Powell store and inspected and photographed the item. He testified that the item "was a two pound UMP [Ultimate Muscle Provider] container, which is a protein container, and it had packing material in there along with vials of steroids." Trial Transcript, Vol. I at 145. Typically, UMP containers contain powder protein. Liston testified that based upon his own experience using steroids in the past, he believed that the vials found in the UMP container contained illegal anabolic steroids. At the time, appellant was in Nebraska.

{¶6} Because he was concerned with how appellant's sale of the illegal steroids out of a Supzilla storefront would negatively impact the Supzilla brand and with the potential damage to customers, Liston contacted appellant by phone on September 4, 2015 and told him that Austin Pagani had informed him about the anabolic steroids. Liston testified that he told appellant that they could no longer do business with him and that when appellant returned, appellant should meet Liston at the Powell location, grab his belongings and they could discuss buy-out options. According to Liston, appellant, who appeared agreeable to a buy-out, initially denied ownership of the steroids, but then admitted that the steroids were his. Appellant also denied selling the steroids, but, according to Liston, apologized for having the steroids at the store.

{¶7} Liston testified that he never called the police and that he also found two boxes with syringes and vials of liquid steroids and oral steroids in the back room behind the retail store and photographed them.

{¶8} When appellant was out of town from September 4, 2015 through September 8, 2015, Liston and Austin Pagani continued operating the Powell Supzilla store. On September 8, 2015, the Powell Police Department was contacted by Ryan McFann, appellant's friend, regarding a civil matter at the Powell Supzilla. After McFann

told Officer Scott Sanford of the Powell Police Department that the business should be closed and that there should not be anyone in the store, the police left a message for appellant to get in touch with them. When the police spoke with appellant, he indicated to them that Liston and Wade Kirk were at the store and had changed out his account routing numbers for the store and that no one was supposed to be on the premises. Appellant also told the police that he was the only one on the lease. After determining that appellant was the only one on the lease, the police escorted Liston, Kirk and Austin Pagani off the premises. Based on information received from Liston about what was inside the store, Powell police obtained a search warrant and searched the Powell Supzilla location. They seized the UMP container, vials with pink and orange caps, and a number of syringes.

{¶9}     At trial, Austin Pagani testified that he was hired in August of 2015 to work at the Powell Supzilla store. He testified that he knew that appellant was using steroids during this period because he was shown the box in the back of the store and observed appellant inject himself with steroids in the back of the store "at least a minimum of two times a week." Trial Transcript, Vol. II at 214. According to Pagani, the vials of anabolic steroids that appellant used had either pink or orange caps and appellant told him that one contained testosterone cypionate and the other testosterone propionate. When asked if he was using steroids during this time period, Pagani stated that he was because he was preparing for the world championships in 2015. Appellant, he testified, showed him how to inject them into his buttocks and thighs. While Pagani initially obtained his personal supply of anabolic steroids from someone else, he testified that he asked appellant to supply him with DBOL (methandrostenolone) and Anavar, which is another anabolic steroid.

{¶10} When asked if he had ever seen appellant selling steroids out of the Powell Supzilla, Pagani testified that he had and that people would walk into the back of the store and leave with a container that he knew was empty. He testified that appellant was "very open" about the sale of steroids and told Pagani what he was selling, who was buying it and what they were buying it for. Trial Transcript, Vol. II at 218. Appellant asked him to give pre-packaged containers to specific individuals.   On two or three occasions, the people came in and the container was exchanged without any money collected. The third time, in September of 2015, when appellant was leaving Ohio to visit family, he asked Pagani to hand the customer the UMP container, collect the money and then put the money into a blue money bag that was near the store's iPad –based cash register. The $200.00 to $300.00 that Pagani collected from the customer was not registered on the iPad in accordance with appellant's instructions. When he looked into the UMP container, Pagani observed the same orange and pink capped vials that he had seen appellant use to inject himself with anabolic steroids along with silver packages of DBOL and Anavar, anabolic steroids.

{¶11} Pagani testified that he saw appellant purchase various items from Ryan McFann, who he thought was appellant's supplier. He further testified that he observed appellant open packages from McFann and split the items in the packages up.

{¶12} Because he had never exchanged a package containing what he thought were illegal steroids for cash before and thought that he could get in trouble, Pagani testified that he contacted Keven Liston and photographs were taken of the UMP container. According to Pagani, between September 4, 2015 and September 8, 2015, attempts were made to remove the UMP container from the store. He testified that Cody

Martin, who he believed had purchased anabolic steroids from appellant, came to the store on September 4, 2015 and asked to use the bathroom at the back of the store. Pagani testified that he saw Martin take the vials that were in the UMP container and put them into a different container in an attempt to remove them from the store. Martin, after being confronted by Pagani, left the store without the steroids.  On September 8, 2015, Ryan McFann arrived shortly after the store opened to look for the steroids in the back of the store and took Pagani's store key.

{¶13} Jessica Kaiser, who is a forensic scientist with the Bureau of Criminal Investigation, testified that 20 glass vials with orange caps that had been seized by the police tested positive for testosterone enanthate, a Schedule III controlled substance. The total weight was 170.20 grams. She further testified that 69 glass vials with pink caps that were seized contained testosterone propionate, also a Schedule III controlled substance. The weight was 624.36 grams.  She testified that three glass vials with pink caps contained 27.33 grams of testosterone propionate. Testing revealed that another vial seized contained 9.17 grams of testosterone enanthate although the label said testosterone cypionate. Kaiser testified that capsules that were seized during the search were found to contain 29.73 grams of methandrostenolone, a Schedule III controlled substance.  A total of 831.50 grams of testosterone was seized during the search.

{¶14} Over appellant's objection on the basis of Evid.R. 404(B), the trial court permitted Powell Detective Ryan Pentz to testify about over 26,000 text messages appellant participated in between January 1, 2015 through September 8, 2015. As part of his investigation, Detective Pentz obtained a search warrant for appellant's phone and had a forensic download performed on the phone generating a roughly 2,500 page report.

Detective Pentz testified that as he was reviewing the messages, he would write down certain terms and then search for them in the report. The following testimony was adduced when he was asked what those terms were:

**{¶15}** A: You know, one of the very first terms I did a search for, because it's a term I saw was steroids. And then, you know, I learned a new term, cypionate. I would learn a new term of CYP. I would learn a new test, testosterone. I would learn a term of SARMS. And I noticed how they would reference certain terms. Sometimes it might be - - testosterone might be referenced test. And so I just started doing research for all these different terms that I was learning through this report.

**{¶16}** Q: Was one of those terms gear?

**{¶17}** A: I learned the word gear, and learned through the report that gear was being referenced as steroids. So then I would do a search for gear and come up - - every time I could find the word gear.

**{¶18}** Q: And after you did the search, you mentioned something about seeing the context of how that was used?

**{¶19}** A: Correct. So once I found these terms and where they were at within the report, I would read the context of what's going on, who is saying what, who is sending what, who is replying, what are they saying, and look at the context of that terminology, and how it's being referenced.

**{¶20}** Trial Transcript, Vol. II at 403-404.

**{¶21}** Detective Pentz testified that State's Exhibit 16 was a message between appellant and Hailey Clark, who had worked for appellant at the Powell Supzilla from 2014 until May of 2015 and who testified at trial, in which appellant talked about having legal

troubles involving "roids and Supzilla." Trial Transcript, Vol. III at 413. Appellant, in one of the messages to Clark that was admitted as Exhibit 16, stated when asked why he was being accused of selling steroids that it was "Probably cuz I have it. And I've gave some to friends out of my personal stash." He further told Clark in a message dated September 4, 2015 that he had "gear" at the store that Liston had found. In conversations with Cody Martin dated between January 22, 2015 and August 23, 2015 (Exhibit 74), appellant was asked by Martin how much it would cost to be hooked up with steroids and was asked if "tren and test for starters" would be okay. Appellant indicated to Martin that the cost would be $220.00 for tren and $200.00 for "test" and in later messages instructed Martin on how to inject the substances.  Appellant also informed Martin that there were side effects from steroid use and, in one exchange dated April 21, 2015, sent Martin a photograph of what appears to be four vials of anabolic steroids in a row and indicated that they were for sale. The vials appear to contain "Trenbolene Enanthate," "Testosterone Cypionate," "Tri Test" and "Masteron."  Detective Pentz testified that he researched the name of the company on the vials, which was Boehringer Ingelheim, and that it was a pharmaceutical company.

{¶22}  Detective Pentz also testified about the contents of conversations between appellant and Jake Coyler, which were admitted as Exhibit 76. On April 23, 2015, the two talked about "tren" and "test" in their messages and a reference was made to "Boehringer test".    One of the vials that was in the photograph that appellant sent to Cody Martin contained "Tri Test." In messages dated starting on January 14, 2015 between appellant and Jeff Yates that were admitted as Exhibit 77, appellant suggested that Yates get "on some gear" and recommended that Yates use "Tren, test, mast."  When asked where he can get some mast, appellant responded that he might have some in his personal stash

and that the cost was $85.00.  On February 2, 2015, Yates sent a message to appellant stating that he needed "test cyp x 2 Mast and tren" and appellant indicated that he will let Yates know.

**{¶23}** Appellant's conversations with Josh Rodrigez were testified to by the Detective and admitted as Exhibit 78. In a message to appellant dated June 23, 2015, Rodrigez told appellant that he needed his "gear" and appellant indicated that he should have it by Friday and that the cost was $300.00 for the gear, which included tren. Detective Pentz, when asked the significance of the term "gear" used in this context, testified that the term was being used "as a slang word for steroids." Trial Transcript, Vol. III at 453. Detective Pentz also was questioned about conversations between appellant and Tim Cronin, a friend of appellant's who was a police officer in Nebraska, which were admitted as Exhibit 81. During the conversations, which started on June 12, 2015 and continued until August 14, 2015, Cronin asked appellant about Anavar and appellant referred him to a website named Roidsource.biz. In a message to Cronin dated August 14, 2015, appellant asked him how much "var" he wants and Cronin indicated that he wants 200 tabs. Appellant then sent a message to Ryan McFann, asking how much the 200 tabs would cost and after receiving a reply, sent a message to Cronin stating that the cost was $300.00. In another message, appellant informed Cronin that "var" was a light steroid. Appellant, in a message to Cronin dated August 14, 2015, tells Cronin that "[i]f you run your gear correctly you won't get gyno".

**{¶24}** Detective Pentz testified that he discovered text message exchanges between appellant and Ryan McFann that led him to believe that appellant was buying drugs from McFann. The messages were admitted as Exhibit 83. On June 16, 2015,

McFann sent appellant a detailed list of the prices for various drugs including "Enanthate", "test", "Prop", "Cyp", "Tren" and "Mast", among other items, and indicated that there was a $200.00 minimum order. In a message to appellant dated June 20, 2015, McFann told appellant that he had "a bunch of prop I over ordered" and asked appellant if he wanted "to work a bulk buy on em." Throughout the messages, which date from May 4, 2015 to August 28, 2015, appellant indicated that he needed "cyp", "tren", "test" and "var" and was quoted prices by McFann.

{¶25} Detective Pentz also examined appellant's chronological messages from September 4, 2015 through September 8, 2015 (Exhibits 85-88). In a message to appellant from Cody Martin dated September 4, 2015, Martin indicated that he could not get "it" because "Austin said he wasn't' aloud (sic)." Detective Pentz testified that this confirmed with what Austin Pagani had said about Cody Martin coming into the store to try to remove items. In another message from Ryan McFann to appellant dated September 4, 2015, McFann told appellant to say that they were trying to blackmail him. On the same date, McFann sent a message to appellant advising him to say that the UMP container with the "gear" in it was not his. In a September 7, 2015 message to appellant, McFann advised him to contact the police and act like the "gear" found in his Supzilla store was a "complete setup." On September 8, 2015, appellant and McFann agreed, as evidenced by messages, that appellant would call the police and tell them that Kevin Liston and his associates had been in control of the store for a week and "anything in there illegal was put thwre (sic) by them in an attempt to blackmail you." Tim Cronin, in a September 8, 2015 message to appellant, instructed him to tell the police that he had not been at the store for over a week and that he had found the steroids.

{¶26} On cross-examination, after testifying at length about the messages, Detective Pentz testified that prior to this case, his involvement in drug cases was pretty minimal and that he did not consult with an expert on steroids.

{¶27} After the State rested, appellant called Kyle Brammer as a witness. Brammer testified that he worked for a sports supplement distributor and was familiar with the ban on pro-hormones in late 2014 or early 2015. He testified that  some pro-hormones had not been banned and were still on the market. According to him, manufacturers of pro-hormones used the names of commonly known steroids for their products as a marketing tactic to attract more purchasers who would be intrigued that they might get the same result as from an illegal substance. He testified that Hi-Tech Pharmaceuticals produced and marketed pro-hormones under the brand names Anavar, Sustanon 250 and Anabol which were "basically illegal precursor names, but they are not the actual product." Trial Transcript, Vol. III at 585.

{¶28} Appellant testified on his own behalf at trial. He testified that he was a personal trainer and body builder and that, as a body builder, he had used steroids and pro-hormones. Appellant testified that some common names of steroids were "ren, cyp, sus, EQ, Anavar,,…mast." Trial Transcript, Vol. IV at 618. When asked if they were associated with anything other than steroids, appellant testified that they also were associated with pro-hormones. According to appellant, pro-hormones were legal to sell prior to their ban in 2014 and mirrored the effects of steroids. He testified that not all pro-hormones were banned, but that "[i]t was the compound that was banned." Trial Transcript, Vol. IV at 625. Following the ban, pro-hormones which did not contain the

prohibited compounds remained to be legal to sell.  Appellant testified that after the ban, the same names were used for the pro-hormones.

{¶29} Prior to the ban, appellant had been selling pro-hormones. He testified that he had purchased pro-hormones from Ryan McFann and that, after the ban, there were still pro-hormones available. He testified that in early 2015, he started selling new supplements being developed by a company owned by McFann which were a mixture of legal pro-hormones and SARMS (selective androgen receptor modulators).  When asked if he put these products on his shelf, appellant said that he did not because they did not have labels "and came under the shady gray area." Trial Transcript, Vol. IV at 635. Appellant testified that he did not sell steroids, but sold pro-hormones. He testified that the vials of steroids recovered during the search of the store were not his.

{¶30} On cross-examination, appellant admitted that he possessed small amount of illegal steroids or "gear" in the Powell Supzilla store.

{¶31} The jury, at the conclusion of the evidence and the end of deliberations, found appellant guilty of a lesser included offense of trafficking in drugs as charged in Count One and possession of drugs as charged in Count Two. The jury found appellant not guilty of the other two counts.   The parties agreed that Count One and Two were allied offenses and the State elected to proceed at sentencing on Count Two due to merger. As memorialized in a Judgment Entry filed on April 18, 2017, appellant was sentenced to three years in prison and fined $10,000.00.

{¶32} Appellant now raises the following assignments of error on appeal:

{¶33} I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE STATE TO INTRODUCE INADMISSIBLE AND HIGHLY PREJUDICIAL EVIDENCE

OF PRIOR BAD ACTS OF THE APPELLANT, IN VIOLATION OF RULE 404(B) OF THE

OHIO RULES OF EVIDENCE.

**{¶34}** II. THE TRIAL COURT ERRED WHEN IT PERMITTED LAY WITNESS

OPINION TESTIMONY OF THE MEANING OF APPELLANT'S COMMUNICATIONS, IN

VIOLATION OF RULE 701 OF THE OHIO RULES OF EVIDENCE.

**{¶35}** III. THE VERDICTS RETURNED BY THE JURY WERE INCONSISTENT

WITH THE PHYSICAL EVIDENCE AND COULD NOT SUPPORT THE FINDINGS OF

GUILTY ON COUNTS ONE AND TWO.

**{¶36}** IV. THE VERDICTS WERE NOT SUPPORTED BY THE MANIFEST

WEIGHT OF THE EVIDENCE.

I

**{¶37}** Appellant, in his first assignment of error, argues that the trial court erred in allowing Detective Pentz to testify about the more than 26,000 text communications between appellant and various other individuals between January 1, 2015 and September 8, 2015 because this was inadmissible and highly prejudicial evidence of other bad acts in violation of Evid.R. 404(B).

**{¶38}** Evid. R. 404(B) provides, in relevant part, as follows:

(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶39}** R.C. 2945.59 similarly provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶40} As noted by the court in *State v. Nucklos*, 2nd Dist. Clark No. 06CA0023, 2007-Ohio-1025 at paragraph 78:

Evid.R. 404(B) and its companion statutory provision, R.C. 2945.59, are concerned with extrinsic acts. "An extrinsic act is simply any act which is not part of the operative facts or episode of the case; i.e., it is 'extrinsic' usually because of a separation of time, space, or both." Weissenberger's Ohio Evidence Treatise (2006), Section 402.21. "Generally, extrinsic acts may not be used to suggest that the accused has the propensity to act in a certain manner." *State v. Crotts,* 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 18.

{¶41} "Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281–82, 533 N.E.2d 682, 689–90 (1988). Evidence to prove the "type" of person the defendant is in order to show he acted in

conformity therewith in the instant case is barred by Evid.R. 404(B). *State v. Greene*, 5th Dist. Tuscarawas No. 2012 AP 02 0018, 2012–Ohio–5624, 983 N.E.2d 773, ¶ 35.

**{¶42}** The Ohio Supreme Court has set forth a three-part test for determining the admissibility of other acts evidence:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

**{¶43}** *State v. Williams*, 134 Ohio St.3d 521, 2012–Ohio–5695, 983 N.E.2d 1278, ¶ 20.

**{¶44}** The trial court's admission of other acts evidence is reviewed under an abuse of discretion standard. *State v. Morris*, 132 Ohio St.3d 337, 2012–Ohio–2407, 972 N.E.2d 528. In order to find an abuse of discretion, we must find the trial court's decision was arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶45}** At trial, appellant objected to Detective Pentz's testimony about the text messages which covered the period from January 1, 2015 through September 8, 2015

between appellant and various individuals. Appellant specifically argued that none of the messages related to the substances seized from his store on September 8, 2015. Appellant argued, therefore, that such evidence "constitutes 404B evidence…" Trial Transcript, Vol. II at 282.

**{¶46}** However, we concur with appellee that the text message conversations did not constitute evidence of prior bad acts in violation of Evid.R. 404(B). The indictment alleged that appellant had trafficked in drugs and/or possessed drugs during the period from January 1, 2015 through September 9, 2015.  As appellee argued before the trial court:

> [w]ith regard to the question about whether or not this is 404B evidence, it's
>
> not. It's evidence of trafficking in steroids and possession of steroids during
>
> the period of the indictment. Yes, for the bulk amount, we have to weigh the
>
> stuff that we actually recovered. But all of that evidence during the period of
>
> the indictment from January 1, 2015 through September 8, demonstrates
>
> that he [appellant] was receiving steroids, he was packaging them for sale.
>
> He was distributing them to other people, that he was in possession of them.
>
> And all of that then reflects that the steroids that were located in the back of
>
> his store amongst his personal items in those boxes are, in fact, his steroids.

**{¶47}** Trial Transcript, Vol. II at 285.

**{¶48}** We find that the evidence relates to the counts charged in the indictment and the circumstances surrounding appellant's prosecution, which leaves this evidence outside the purview of Evid.R. 404(B). The text message conversations were not

"extrinsic acts" because they were part of the operative facts in this case and related directly to conduct alleged in the indictment.

{¶49} Appellant's first assignment of error is, therefore, overruled.

II

{¶50} Appellant, in his second assignment of error, contends that the trial court violated Evid.R.701 when it permitted lay witness opinion testimony pertaining to the meaning of appellant's communications. Appellant specifically argues that the trial court erred in permitting Detective Pentz to testify regarding his conclusions as to the meaning of terms used in appellant's over 26,000 text messages and in permitting him to testify regarding the believability of one witness' testimony over appellant's testimony.

{¶51} Initially, we note that appellee argues that appellant did not properly preserve for appeal his argument relating to Detective Pentz's opinion testimony regarding the meaning of terminology used in the text messages. Appellee concedes that at trial, appellant's defense counsel objected twice to such testimony, but his objections were overruled. The trial court, in overruling the second objection, stated that Detective Pentz was entitled to give his opinion under Evid.R. 701.

{¶52} Evid.R 103(A) states, in relevant part, as follows: "Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

{¶53} *(1) Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or…"

**{¶54}** We find that appellant objected twice to Detective Pentz's testimony and that he did not need to continually reassert his objection to the admissibility of such testimony. See *State v. Davis*, 10th Dist. No. 96APC04-524, 1996 WL 673541.

**{¶55}** The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co.*, 60 Ohio St.3d 120, 122, 573 N.E.2d 622, 624 (1991).

**{¶56}** " Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses." *State v. Harper,* 5th Dist. Licking No. 07 CA 151, 2008-Ohio-6926, ¶ 42, citing *City of Urbana ex rel. Newlin v. Downing,* 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989) and *State v. Kehoe,* 133 Ohio App.3d 591, 603, 729 N.E.2d 431 (12th Dist.1999). "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Lay opinion, inferences, impressions or conclusions are therefore admissible if they are those that a rational person would form on the basis of the observed facts and if they assist the jury in understanding the testimony or delineating a fact in issue. *Id.* "[A]n opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact". Evid.R. 704.

**{¶57}** The distinction between lay and expert-witness opinion testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that only specialists in the field can master. *State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-41, 744 N.E.2d 737.

**{¶58}** We find that the trial court did not abuse its discretion in holding that Detective Pentz's lay opinion testimony regarding the text messages was admissible under Evid.R. 701 and that the trial court's decision was not arbitrary, unconscionable or unreasonable. Detective Pentz's testimony was rationally based on his perceptions and helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. At trial, Detective Pentz testified that he reviewed a 2,500 page PDF report that contained 26,000 text messages taken from appellant's phone. He testified that he did not review every text message, but reviewed the report, starting at the beginning. He further testified that he kept a note pad next to him and would write down certain terms and then search the report for words and phrases that matched that context. According to him, as he located the terms and where they were within the report, "I would read the context of what's going on, who is saying what, who is sending what, who is replying, what are they saying, and look at the context of that terminology, and how it's being referenced." Trial Transcript, Vol. II at 404. We further note that a binder of the text messages was marked as more than one Exhibit and admitted at trial. The jury thus had the chance to independently review the text messages including, for example, Exhibit 74, which specifically discussed the sale of "steroids". Furthermore, the jury also heard testimony from Kevin Liston and others as to the meaning of the terms used in the messages. Liston, for example, testified that the term "gear" was "just a short-term for

steroids where if you're talking in public, you don't want people to,…understand what you're talking about with steroids, so you say gear." Trial Transcript, Vol. I at 142. Austin Pagani also testified that "gear" referred to steroids and not pro-hormones. Trial Transcript, Vol. II at 225.

{¶59} Appellant, as is stated above, also maintains that the trial court erred in permitting Detective Pentz to give an opinion as to the credibility of Austin Pagani. Pagani testified that Cody Martin, on September 4, 2015, had attempted to remove vials of steroids from the back room of the Powell Supzilla store but was not successful. During his testimony, Detective Pentz later testified about text messages found on appellant's phone.  The following is an excerpt from his testimony at trial:

{¶60}   Then text messaging, 3:18 to Cody Martin:  Call me when you get a chance. 3:19, phone call from Cody.  3:58: You get it?  Cody - - from the defendant to Cody:  You get it?

Cody:  No man.

Defendant says why.

Cody says: I couldn't.  Austin said he wasn't allowed.

{¶61} Q:  Detective, did you put any significance in into this after having talked to Austin?

{¶62} A:  I did.  Cody, after talking to Austin - -

MR. LONG: Objection, Your Honor.

MR. WALTER:  This is already in the record as testimony from Austin.

MR. LONG: He's rendering a conclusion.

That's for the jury to reach.

THE COURT:  I'll overrule.

**{¶63}** Q:  You've heard Austin testify here, right?

**{¶64}** A:  Correct.

**{¶65}** Q:  Did you take what you saw in the text messages and what you heard from Austin, what was the significance you heard from that?

**{¶66}** A:  It backed up what Austin was saying, that Cody came to the store to try to remove the packages.

**{¶67}** Trial Transcript, Vol. III at 497-498.

**{¶68}** Appellant later testified that he had asked Cody Martin to go to the store and get appellant's personal items out of the store, including his sweater, vest, shirt and some shoes.

**{¶69}** Appellant now argues that Detective Pentz's testimony was impermissible credibility testimony that established that Pagani was being truthful while appellant was not. However, Detective Pentz did not state that he believed the witness was telling the truth or give an explicit opinion as to Pagani's credibility. See, for example, *State v. Myers*, 5th Dist. Richland No. 03–CA–61, 2004 WL 1327929 at paragraph 64 (June 9, 2004) ("The detective conducted an initial interview with Ms. Adkins that was not tape recorded. Over a week later he interviewed her and this time made a recording of the interview. The testimony objected to by appellant was that the second statement was consistent with the first statement (T. at 910). The officer was testifying to a fact, not expressing an opinion about the credibility or veracity of the complainant."). We find, therefore, that the trial court did not err in allowing his testimony since it was not impermissible credibility testimony.

Detective Pentz was testifying as to a fact, not expressing an opinion at to Pangani's credibility or veracity.

{¶70} Appellant's second assignment of error is, therefore, overruled.

III

{¶71} Appellant, in his third assignment of error, argues that the jury verdicts were inconsistent with the physical evidence and could not support a finding of guilty on Counts One and Two.

{¶72} Appellant, in the case sub judice, was indicted on one count (Count One) of trafficking in drugs (testosterone), one count (Count Two) of possession of drugs (testosterone), one count (Count Three) of trafficking in drugs (methandrostenolone), and one count (Count 4) of possession of drugs (methandrostenolone). While appellant was found not guilty of the two counts related to methandrostenolone, he was found guilty of the two counts involving testosterone.  Appellant notes that there was testimony at trial that all of the drugs were located in the same UMP container in the Powell Supzilla back room and argues that his convictions, therefore, were inconsistent with the physical evidence. According to appellant, "[t]he jury could not reasonably come to the conclusion that Appellant owned or possessed only part of the contents of the UMP container."

{¶73} An inconsistent verdict may be a result of leniency and compromise by the jurors, rather than being caused by jury confusion. *State v. Fraley,* 5th Dist. Perry App. No. 03CA12, 2004–Ohio–4898, ¶ 15, citing *United States v. Powell* , 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). See, also, *State v. Ballard,* 8th Dist. No. 88279, 2007–Ohio–4017, ¶ 18. "Consistency between verdicts on several counts of an indictment is

unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal." *State v. Trewartha,* 165 Ohio App.3d 91, 2005–Ohio–5697, 844 N.E.2d 1218 at paragraph 15 (10th Dist), citing *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978) vacated in part on other grounds in *Adams v. Ohio,* 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103. Every count of a multiple-count indictment is considered to be distinct and independent of all the other counts; therefore, inconsistent verdicts on different counts do not justify overturning a verdict of guilt. *Id.* (Citations omitted). As the Ohio Supreme Court has stated, "the sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy*, 79 Ohio St.3d 440, 444, 1997-Ohio-371, 683 N.E.2d 1112.

**{¶74}** Because appellant's argument is that the juror's verdicts were inconsistent across multiple counts rather than within a single count, based on the law set forth above, we cannot justify overturning the jury verdict.

**{¶75}** Accordingly, appellant's third assignment of error is overruled.

IV

**{¶76}** Appellant, in his fourth and final assignment of error, maintains that the verdicts were against the manifest weight of the evidence.

**{¶77}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must

be overturned and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997 -Ohio- 52, 678 N.E. 2nd 541, superseded by constitutional amendment on other grounds as stated by *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶78}** Appellant's argument focuses on the credibility of the witnesses. Appellant argues that Kevin Liston, Austin Pagani and Detective Pentz were not credible witnesses. However, the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 231, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) citing State v. Nivens, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

**{¶79}** In the case sub judice, the jury heard the witnesses, viewed the evidence, which included the text messages, and heard appellant testify. There was testimony from Austin Pagani that he had observed appellant selling testosterone in the Powell Supzilla store. Kevin Liston testified that when he confronted appellant, appellant admitted to owning the substances found in the store. Moreover, during the text message conversations between appellant and numerous other individuals that were admitted, appellant, as noted by appellee, "discussed the use and sale of testosterone over the eight months leading up to this discovery of more than 800 grams of testosterone at the Powell Supzilla." In text messages between Ryan McFann and appellant, the two discuss telling the police that Liston and others had planted the steroids in the store in an attempt to blackmail appellant.

**{¶80}** We find, upon reviewing the facts as set forth in detail above, that this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost its way nor created a miscarriage of justice in convicting appellant.

**{¶81}** Appellant's fourth assignment of error is, therefore, overruled.

{¶82}  Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Earle Wise, J. concur.