[Cite as *State v. Lavender*, 2019-Ohio-5352.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180003 |
| | | TRIAL NO. B-1700948 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| ANDREW LAVENDER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 27, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Wendy R. Calaway*, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}    In eight assignments of error, defendant-appellant Andrew Lavender claims that he was improperly convicted of aggravated murder and sentenced to life in prison without the possibility of parole.  For the reasons set forth below, we disagree with those assertions and affirm the judgment of the trial court.

### The Killing of Ceran Lipscomb

{¶2}    During the evening of August 1, 2014, Ceran Lipscomb was shot and killed by an individual using a .22-caliber weapon.  A man named Ramon Davis was using a portable restroom in the area when the shots were fired.  He fled from the restroom and called 911.  He told the operator that he had seen someone running from the body.  He described the man as between 40 and 50 years old, five feet eight inches tall, and slender.  He said that the man had on purple jogging pants, a black top, and a cap, and had a mustache or goatee.  Another individual, 15-year-old Dennis Coulter was outside his apartment with his cousin when the incident occurred.  He told police that he saw the shooter run away from the body and down an alley behind the apartment buildings.  He said he saw the man two different times: once as he was running from the body, and again as he was running in the alley behind the apartments.  Coulter told police that he had seen the man before in the neighborhood but did not know him or know his name.

{¶3}    A few days after the shooting, Coulter worked with a sketch artist to generate an image of the shooter's face.  Police had little more to go on until Domingo Johnson was arrested on a number of drug-related charges.  He contacted the investigating detectives and informed them that he had information on the Lipscomb killing.  He told police that shortly before the killing, he was in an apartment when he overheard a young man he knew as "Shooter" bragging about how he was taking a hit on "Little Charlie's Brother."  The name "Little Charlie" was a

name associated with Lipscomb's brother. He also said that Shooter had a small caliber revolver. Using social media, detectives were able to connect the name "Shooter" with defendant-appellant Andrew Lavender. Johnson identified Lavender as the person he overheard talking about the hit. The police requested a photo array from the Hamilton County Juvenile Court, since Lavender was 16 years old at the time, and presented the photo array to Coulter. Coulter was shown the images one at a time. As Coulter was going through each image, he initially said that another man pictured looked like the shooter. As he continued though the rest, however, he then reached Lavender's picture and positively identified him.

{¶4} Lavender was arrested and police gained access to his cellular phone data. Of significance, police retrieved thousands of text messages from his phone going back months before the shooting. The vast majority of these text messages were introduced at trial by the state, for the purpose of attempting to show Lavender's growing desperation with regard to money, which lead Lavender to agree to kill Lipscomb for hire. After conducting a hearing on the matter, the trial court admitted the vast majority of these text messages for the limited purpose of allowing the state to show Lavender's motivation for the killings in his growing desperation with regard to money during the months before Lipscomb's death.

{¶5} Because Lavender was 16 when he committed the offense, his case was first brought in Hamilton County Juvenile Court, in the case numbered 14-7191. The state filed a motion to have Lavender bound over to the adult common pleas docket. After determining probable cause, the juvenile court judge failed to conduct an amenability hearing, believing that the bindover to the adult court was mandatory. Lavender was then indicted in the case numbered B-1405471, and charged with one count of aggravated murder, in violation of R.C. 2903.01(B), and one count of aggravated murder, in violation of R.C. 2903.02(B). Both counts

included firearm specifications. The case proceeded for some time, including the briefing, arguing, and a decision on a motion to suppress the results of the photo array. The case remained pending for three years before the problem with the bindover was discovered. The state then dismissed the case and refiled in the juvenile court. The juvenile court conducted new hearings, this time conducting an amenability hearing. At the conclusion of those hearings, the case was again transferred to the general division of the common pleas court. Lavender was again indicted for two counts of aggravated murder. The case proceeded to a two-week jury trial, after which Lavender was found guilty on both counts and all specifications. On the first count, Lavender was sentenced to life in prison without the possibility of parole, with an additional three years for the gun specification. The second count was merged with the first. In eight assignments of error, Lavender now appeals.

### Admission of Evidence

{¶6} In his first assignment of error, Lavender claims that the trial court erred when it admitted certain evidence. In particular, he claims that the admission of a photograph from Facebook showing him posing with weapons was improper. He also claims that the admission of his text messages was improper. And he finally claims that it was improper for the court to allow an officer to testify about how contract killings are conducted.

#### The Photograph

{¶7} In the photograph Lavender challenges, he is seen pointing one gun at the camera while holding another gun at his side. Neither side has argued that the gun Lavender is pointing at the camera is related to the case. But the state argues that the gun in his other hand appears to be a small-caliber revolver. Lipscomb was killed by a .22-caliber weapon, and the state theorized that the weapon was a

4

revolver because no casings were found at the crime scene  A revolver would retain its bullet casings in its cylinder, while a semi-automatic pistol would eject the casing after firing each round.  The state's expert could not confirm that the shots were fired from a revolver but did say that the physical evidence would be consistent with that. He said that it was "very common to find .22 caliber ammunition chambered in revolvers."  When shown the photograph, he said that "based on what I can see it certainly appears to be most consistent in physical shape with a revolver simply because of the width versus the length, and it looks like basically a small-sized handgun."  He further said that "it looks like a very small revolver and you will find a lot of .22 caliber handguns in a small sized frame handgun."

{¶8}    Prior to the testimony from the expert about the weapon, the trial court conducted a hearing.  Initially, there were three photographs proposed for admission by the state.  The other photographs included different weapons.  Citing *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, Lavender argued that the photographs that showed Lavender with another weapon and another person holding a revolver with Lavender present were unduly prejudicial. After hearing the argument, the trial court allowed only the photograph of Lavender with the revolver in his hand concluding, "assuming a proper foundation is laid and relying on the prosecutor to establish the fact that Mr. Lattyak would testify that it was a revolver and that it was a .22, and if he's shown the photograph of 16(A), which includes the revolver in the hand of what purports to be the defendant, that that [sic] would be admissible."  During the testimony, clarifying rulings were made.  First, the trial court allowed the state to continue questioning about the photograph "if the foundation was laid or if it was at least established that the revolver could have been the type consistent with .22 bullet that was recovered [sic]."  The trial court also ruled that when the witness seemed hesitant to identify the type of handgun in the

photograph, the state could lay "additional foundation * * * such that if the expert would say that the revolver would be consistent with the type of gun used for the bullet recovered."

{¶9} The admission of evidence is within the sound discretion of the trial court. *See State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 61. We will not disturb a trial court's ruling on evidentiary issues on appeal absent an abuse of discretion and proof of material prejudice. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181; *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116.

{¶10} The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Body Power, Inc. v. Mansour*, 1st Dist. Hamilton No. C-130479, 2014-Ohio-1264, ¶ 28, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 291, 450 N.E.2d 1140 (1983). Most cases will fall within the "unreasonable" prong of discretionary decisions, as few judges issue decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). A decision is unreasonable if

> there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

*Id.* "An abuse of discretion implies that a decision is both without a reasonable basis and is clearly wrong." *Aetna Better Health, Inc. v. Colbert*, 10th Dist. Franklin No. 12AP-720, 2012-Ohio-6206, ¶ 21, citing *Hartzog v. Ohio State Univ.*, 27 Ohio App.3d 214, 500 N.E.2d 362 (10th Dist.1985).

{¶11}    The state's theory, based on the lack of casing at the scene, was that the .22-caliber bullet that killed Lipscomb came from a revolver.  Further, Coulter testified that he had seen the shooter wrap the small handgun in his shirt as he ran away, indicating that a rifle was not involved.  The expert witness testified that the photograph was consistent with a .22-caliber handgun, and Johnson testified that he had seen Lavender with a small revolver prior to the shooting.

{¶12}    "Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant." *State v. Wright*, 48 Ohio St.3d 5, 8, 548 N.E.2d 923 (1990).  Courts have said that the admission of a photograph of a defendant with a weapon is appropriate when it is *similar* to one seen used in a crime. *See, e.g.*, *State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 12. Similarly, the trial court here allowed the admission of the photograph of a handgun that was similar to the type of weapon that law enforcement believed was used in the case and had been tied to Lavender through Johnson.  Lavender was able to then attack whether that asserted connection was credible, which he did through counsel's effective cross-examination and closing argument.

{¶13}    In this case, we cannot conclude that the decision of the trial court was "without a reasonable basis" or "clearly wrong."  We conclude that the trial court had a reasonable basis to determine that the photograph was relevant, admissible, and that the probative value of the photograph was not substantially outweighed by undue prejudice.

### Text Messages

{¶14}    Lavender makes several intertwined arguments related to the text messages that were admitted at trial.  He claims that the admission of the entire record of the text conversations covering the period of several months prior to the killing was improper as "hundreds of the texts were completely irrelevant."  He then

7

argues that some of the text messages violated Evid.R. 403, and others vi0lated Evid.R. 404. In order to analyze this portion of his argument, however, we must give a detailed account of how the text messages were handled during the course of the trial.

{¶15} Detective Gregory Gehring was the state's witness through whom the text messages were admitted. He was the officer who worked with employees of Cincinnati Bell to obtain the records, though the records custodian from Cincinnati Bell testified for authentication purposes. It is clear that both sides understood that the admission and use of these text messages was going to be a significant issue in the case from an evidentiary perspective. So much so that the trial court held a hearing before Gehring testified to try and determine as many of the legal issues as possible prior to the time the exhibits would be admitted.

{¶16} The text messages were admitted in various forms. First, there was an overall set of two large binders which contained every text message from or to Lavender from April 26 to August 21, 2014 (hereinafter "the comprehensive set"). In addition to the comprehensive set, the state also had a smaller binder of messages that law enforcement was able to retrieve from the cell phone's memory (hereinafter "the memory set"). All of these messages were also contained in the comprehensive set. And in addition to that, the state had a series of specific exhibits (hereinafter "the 15 series") that it had pulled from the comprehensive set for purposes of specific presentation to the jury during the trial.

{¶17} As the hearing began, the trial court pressed the state on the need to admit the comprehensive set to the jury if it was planning on focusing on a small fraction of the total. The state responded that "we were going to do that because it's the records, and then from that book we were going to tell the jury we have those records, which are pages out of that book on different dates indicating different

8

conversations." The state later said that "the problem, too, with these records, Judge, is he's making conversations with different people that have different information about him. When he's talking - - and so if you don't take this stuff as a whole, it's easier to put out of context what the defendant is saying and the import of it." The state also was concerned that if it only offered the individual messages without the context, Lavender could argue that things had been left out and argue what the absent messages might have held.

{¶18} Lavender began the hearing arguing generally that the comprehensive set was objectionable because many of the messages were from several months before the murder, and that they lacked relevance for that reason. He then argued that, for some of the messages, the probative value was substantially outweighed by the prejudicial effect they would have on the jury. Further, Lavender highlighted the danger that, as these text messages related to illegal activity and other things that cast him in a negative light, there was a danger that he would be convicted not on the evidence, but because the jury simply reached the conclusion that he was a bad person who did bad things.

{¶19} The state assured the trial court that the evidence, largely, was not being offered as direct evidence of Lavender's guilt. But rather the evidence was being offered to demonstrate Lavender's motive to take a murder-for-hire contract— the fact that he was increasingly desperate for money. The state argued:

> We're showing it so that the jury has in their minds what's going on in the defendant's life, what he's talking about that's going on in his life that's a motivation for him to do what he's got to do.
>
> And you can kind of see with all of them together how he moves from, you know, he needs money so bad he's going to rob people. He needs money so bad he's going to rob people. [sic] That's

not panning out for him.  He goes to his dad.  His dad's not going to give him money.

He finally gets to the point where he's going to take somebody's life.  And that goes to prior calculation and design.  He starts thinking about it.

You can see in these texts where he's talking about that and he's talking about the people that are trying to talk him out of it.  He's not worried about it.  He's got grown men afraid of him.  He's done it before, he'll do it again.

So all of this is important, extremely important, for the State in being able to properly put into perspective the defendant's intent and motive and some of the other things that are set forth in 404(B).

It certainly lays the groundwork for the jury to understand the situation the defendant found himself in and what his motivation was for doing this.

{¶20}   In response, Lavender began by arguing that much of what was being presented violated Evid.R. 403.

There is no question that much of this what they talked about is far more prejudicial than it is probative.  A lot of it dates back four or five months prior to.  A lot of it is talking about things that is [sic] inconsistent with their theory.  And it's far more prejudicial than it is probative.  It's talking about different acts, shooting into cars, and so forth.  Again, that's extremely prejudicial; far more prejudicial than it is to show that he had a gun and he uses a gun.

That's their reason for some of this coming in.  So, Judge, again, the rule is what it is; although relevant, when it's substantially

outweighed - - and that's what we're dealing with here; a cumulative exhibit that is far more prejudicial than it is probative.

{¶21}   The problem with excising portions of the comprehensive exhibit became clear as the hearing continued.   After discussing a series of messages in which Lavender claimed that people were trying to kill him (some before the shooting, some after), the parties and the court turned to a text message in which Lavender had claimed to have shot into a car with people in it.   The trial court expressed concern with that message, as it did not fit neatly into the state's theory of showing Lavender's increasing desperation for money.   The state responded that it would not strongly object if the court did not admit that text.   At that point, counsel for Lavender interjected:

>   Well, Judge, what I'm concerned about is - - and this is why I think the whole exhibit is a problem.   If we pull out the shooting in the car, which I brought to the Court's attention, that may be the thing that he did why [sic] people want to kill him.
>
>   And that's why the text messaging and it's trying to speculate on what they're talking about is a problem, because that's exactly what you begin to do.   And, again, I believe from looking at it and reading it that that could very well be it.

This conversation was resumed when that particular text message came up during the court's review of the individual text messages in the 15 series.   When it came up during the review, the state suggested it was going to withdraw it based on the previous discussion.   At that point, counsel for Lavender interjected, saying

>   Well, Judge, at this point, if the Court - - because at this point I don't think the Court has decided to exclude anything, if the Court is going to allow all of the rest of it in we just ask that this be included too

because, again, it's our belief that this may be what he's talking about people may want to kill him for [sic].

{¶22} Although never directly stated, it appears that the trial court determined that the safer approach was to allow the comprehensive exhibit in and allow the jury to use it to determine the context of the messages from the 15 series, if needed. As the court said, "That's to be argued in front of the jury where they decide the quality of it." The court advised counsel to review the comprehensive exhibit that evening so that any problematic messages could be addressed and, if need be, redacted.

{¶23} Having decided the general issue of the comprehensive exhibit, the trial court then went on to individually consider the messages that would be published to the jury during trial in the 15 series. After discussing the texts generally, the state gave an overview of the 15 series, which were the texts to which the state would be directing the jury's attention during the trial. The state summarized that the texts, beginning in April, show that Lavender needed money. Initially, Lavender is complaining about not having money, asking people for money, and asking if people know of anyone he can rob. The state then said that "at some point it switches. In about June it switches from trying to rob people to becoming a hitman."

{¶24} One message at a time, the trial court heard argument from counsel on each message from 15a through 15qq. Many of the messages were admitted for the limited purpose of showing motive or intent. Some of the messages, closer in time to the shooting and purporting to speak directly about the shooting, were allowed for all purposes. But there were also several messages that the court decided fell outside the Evid.R. 404(B) exception. The one message regarding shooting the car would have been excluded, had Lavender not withdrawn his objection to it. Another text message that just made a reference to guns without any reference to

12

money or being in need was excluded. Another message about having adults who were afraid of him was excluded.

{¶25} The first question for this court to consider is the admission of the comprehensive set. In his argument to this court, Lavender has argued generally that the admission of the comprehensive set was error because hundreds of texts were irrelevant, and many were prejudicial. But Lavender has not pointed to any text messages in the comprehensive set that were problematic other than messages that were also in the 15 series. Considering the comprehensive exhibit as a whole, Lavender has failed to argue how its admission prejudiced him—distinct from the prejudice he claims to have suffered from the messages in the 15 series. Without a showing of prejudice, we will not conclude that claimed error in the admission of evidence requires reversal. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 74; *see also City of Toledo v. Gorney*, 6th Dist. Lucas No. L-94-152, 1995 WL 136495, *1 (Mar. 31, 1995) (no reversal when part of testimony was relevant and part was irrelevant but not prejudicial).

{¶26} Other than what Lavender argues in the 15 series, and what our independent review of the exhibit has confirmed, there was nothing overtly prejudicial in the text messages in the exhibit. There were several messages that were not relevant, as one would expect by taking the entirety of the text message history from a teenager for a period of six months. But the trial court considered this issue and discussed the matter with the parties. The state's concern with not giving the jury the comprehensive exhibit was that it would be accused of cherry-picking certain texts, taking them out of context, and ignoring other information. Without the context of the whole exhibit it would be a difficult assertion to rebut. Even Lavender's counsel became concerned when the trial court began to suggest that certain messages be excised, as it would not allow Lavender to argue from that same

13

context. Given this situation, and the manner in which the exhibits were presented, we cannot say that the trial court did not have a reasonable basis for allowing the exhibit in, nor can we say that the trial court was clearly wrong. Coupling this fact with the previous conclusion that the extraneous texts were at worst simply irrelevant, we conclude that the trial court did not abuse its discretion when it allowed the admission of the comprehensive exhibit.

{¶27} We now address the specific concerns regarding the messages cited by Lavender in his brief. The Ohio Supreme Court has directed courts to conduct a three-step test to consider whether other-acts evidence is admissible. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20. The second step is to "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether [it] is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* "The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*

{¶28} We begin first with the relevance of the 15 series messages. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." At issue in this case was Lavender's motive to kill Lipscomb, which the state theorized was an increasingly desperate need for money. As the trial court summarized its understanding:

14

I believe their argument is they're not trying to argue to say he's acting in propensity or character - - has that propensity that's what he's doing. They said they're specifically offering it for other purpose, including motive or intent, to go along the lines of prior calculation or design and it wasn't an accident.

That's under 404(B) and that's specifically one of the - - that's expressly stated as an exception. So I believe their argument is to say there's a man that's willing to - - who's desperate and looking to make money any way he can make money and he's trying to find a way - - except for getting a job. And the way he's willing to do things is he's willing to either rob, do whatever else, and it's escalating to the point where he's willing to kill somebody.

Motive is generally relevant in all criminal cases since it is assumed that human behavior is prompted by a desire to achieve specific results. *State v. Curry*, 43 Ohio St.2d 66, 70-71, 330 N.E.2d 720 (1975). In order to show that progression, we cannot say that text messages were irrelevant to establishing motive.

{¶29} The next argument that Lavender makes is that the text messages were evidence of his character, and that the state was trying to demonstrate that his character was such that he was likely to have killed someone for money. Evid.R. 404(A) states that "evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *Id.* at 68.

15

{¶30}    Proving an individual's motivation is seldom a direct process. And while it is not an element of either of the crimes for which Lavender was charged, it was crucial to the state's case. As the Ohio Supreme Court noted, in a murder case where the identity of the killer is shown only by circumstantial evidence, motive becomes an important issue. *State v. Franklin*, 62 Ohio St.3d 118, 128, 580 N.E.2d 1 (1991), citing *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157 (1958).

{¶31}    Often times, this circumstantial evidence of a need for money comes from sources that could otherwise paint a defendant unfavorably. For example, the Ohio Supreme Court has held that a defendant's drug addiction is admissible to prove the defendant's need for money, providing a motive to rob and kill. *State v. Henness*, 79 Ohio St.3d 53, 61, 679 N.E.2d 686 (1997). The Second Appellate District held that evidence of a civil judgment against the defendant physician was admissible in a prosecution for trafficking in drugs to prove the motive of a need for money. *State v. Nucklos*, 171 Ohio App.3d 38, 2007-Ohio-1025, 869 N.E.2d 674, ¶ 70 (2d Dist.). And this court has held that evidence of a defendant's gambling habits was admissible to show the defendant's need for money in a case involving theft in office, bribery, and attempted bribery. *State v. Ridley*, 1st Dist. Hamilton No. C-100301, 2011-Ohio-2477, ¶ 65.

{¶32}    We have reviewed the 15 series of exhibits and have determined that they generally demonstrate the pattern of how desperate Lavender was to make money, and how that need grew over time. In early April of 2014, Lavender texted an individual asking if he knew of someone he could rob. Later that month, he texted his sister asking her if she had any money. In another message, he tells someone that he has no other support and that he's been on his own since he was 11. He relayed that he had been providing for his own needs without being able to rely on his parents. In a text to his father, Lavender berated him for never supporting him,

16

saying that he was tired of holding things in, having to sell heroin and marijuana to get money to support himself, and that his father "ain gtta worry bou me [sic]." May shows that his condition had not improved. On May 9, he asked someone if they knew about someone he could rob. On the 14th, he texted three different individuals asking for money.

{¶33} In June, Lavender appeared to have had something lined up. On the 15th, he texted someone called Ayana, telling her that he was going to do "sum shit [sic]." When she asked what he had planned, he replied "This dude [sic]." When Ayana presses for details, he says he's "[Fixing to] get [somebody] together [sic]," but then tells her that he probably wasn't going to do it that night, but was just preparing for it.

{¶34} The following day, Lavender texted her complaining about life on the streets. Ayana tried to encourage him, but he said that he wanted to give up and that so many people wanted him dead. He said he was afraid that he was not going to amount to anything and that, while he was trying "[not] to feed into it," he was starting to believe it. After more attempts to encourage him, Lavender replied that his own father had abandoned him and he had taken a life before and had tried to kill others. He also related a story about how people he had trusted had "set me up n left me fa dead [sic]." When Ayana told him to take a break from all that, he said that "I [be] trying it's hard I [don't] have a mama to call [when] I'm broke I [gotta] do [what] I [gotta] do to put money [in] my pocket [sic]." Ayana tried to tell him that maybe he should try doing something different, but Lavender responded that he had tried "hella times." Ayana suggested that maybe Lavender could apply for a job, but Lavender shoots that idea down "Bay [for real] I'm ok [sic]." After telling Ayana he just doesn't care about life anymore, he concluded by telling her "I'm ok [at least] I [got] my gun :-) [sic]."

17

{¶35} That same day, Lavender was texting with another number trying to find someone to rob. The person he was texting had a person in mind, but Lavender wanted to make sure that the target had some money because he didn't "wanna rob him [if] he broke [sic]." The next day, he texted Ayana that he had just found out he had a child, who was two years old. On the 19th and 20th, there was a series of messages between Lavender and another person in which Lavender was trying to get money to "flip."

{¶36} The text messages took a turn on June 22. Lavender texted Ayana, telling her "I finna catch a body."[1] Testimony by Gehring established that this meant that he was about to kill someone. Ayana desperately tried to talk Lavender out of it, saying that he must not care about his son or nephew, and that he needed to think about what he's about to do. Lavender simply responded that he refused.

{¶37} The next message in the 15 series was a series of texts from Lavender to someone named Kiara My Queen on July 20—less than two weeks before the murder. He told her that his life had been hard and that he had been providing for himself since he was 12 years old. He recalled an incident when he had been grazed by a bullet and said that "when I was 14 I took two [people's lives]" and that he had shot "hella [motherfuckers] * * * [and] robbed hella [people]." He said he regretted it all. He told her that he remembered going without food and staying outside for days, and that he sometimes didn't want to live anymore and that there was no one to support him. He told the story about how he got kidnapped at age 14 because he had robbed "a dope boy," but that he was let go because his captors feared his older brother. Because he had no one he could count on, he said he had to "do what[ever]

---

[1] The trial court allowed the jury to consider this portion of the message for any purpose, but limited the rest of the message to consideration for only the purpose of motive. The trial court instructed the jury accordingly.

it takes to keep money [in] my pocket[, ] shit to wear[, ] and food [in] my stomach [sic]."[2]

{¶38} Later that day, he told Kiara that he had not eaten since the day before. She told him to get something to eat and go home, but he told her he did not have a home. Then he told her "in a couple weeks or even sooner [than that] I [am going to be playing] with a check [and you're] go[nna] have everything baby * * *." Gehring testified that "getting a check" meant coming into a sum of money. Lavender told her that "we can get a car I'm really [going to] spoil [you] * * *."

{¶39} On July 21, Lavender sent a text message in which he told Kiara about the time that two girls tricked him into getting into a car by asking for marijuana. Lavender said that some people then tried to pull him into the car, so he pulled out his gun and fired nine times. He said that, while this had happened a month ago, they were now calling him to find out where he was.[3]

{¶40} The day before the shooting, Lavender sent a message to Kiara saying that he hoped to die and that his life was over. He also told her his phone was about to be turned off for not paying the bill. When Kiara told him to pay the bill, Lavender responded that he could not. He told her that every time he turned around, someone was asking him for money. He said that he had given his mother $230, had given his sister $60, and given the mother of his child $100. He later texted to another person that everything in his life was going wrong.

{¶41} On the morning of the murder, Lavender received a message that his text messaging had been suspended for nonpayment. The day after the murder, Lavender received a message from Kiara saying "that's why we need a car." He

---

[2] The trial court allowed the jury to consider this message for any purpose, not limiting it to determination of motive. The trial court instructed the jury accordingly.
[3] Lavender's counsel withdrew his objection to this message in a sidebar discussion because, as the trial court summarized the sidebar discussion later, it "became part of the trial strategy."

responded that he was going to save up for one, and that he only needed $2500 for a black Cadillac.[4]

{¶42}   A week after the murder, a person named Tauda texted and offered to give Lavender some money on the first of the follwing month.  And the texter then asked why Lavender was jeopardizing his family and risking spending his life in jail over "bs."  She said that his big brother was already gone and she did not want him to go too.  Lavender responded that he had a son to take care of and that he needed some "shit" and he needed "everything" and that he would not settle for less.  Tauda responded that he will make things worse if he does something that he will regret later, and that he risked getting locked up.

{¶43}   On August 14, there was another exchange between Lavender and another number.  Lavender told the person that his time was running out.  He said that people wanted him dead and that they were trying to find him through social media.  He said that karma was a "mfer" and that he had this coming because he chose this life and that there was nothing he can do but "fight back and let it happen."  After a few more exchanges, Lavender said that he was going to die soon and that he didn't want anyone crying for him.  He said he was trying his best to keep calm.  He concluded by saying that, every night, he "regret it i wish it never happened. [sic]"[5]

{¶44}   Another series of messages from that day between Lavender and someone named Duke were shown to the jury.  In that exchange, Lavender wished the man good luck in his boxing career and said that he wasn't going to be around much longer, because people wanted him dead.  He said that a friend told him that

---

[4] The trial court allowed the jury to consider this message for any purpose, not limiting it to determination of motive.  The trial court instructed the jury accordingly.

[5] The state sought, and the trial court allowed, the jury to consider the messages in this paragraph for the additional purposes of lack of mistake and "how the crime was committed with respect to intent."  The trial court instructed the jury accordingly.

people were looking for him through Facebook, but the friend didn't know them and couldn't tell who they were because "they blocked him or they deleted [their] [Facebook accounts]." Duke offered to stand with Lavender, even if it meant violence. Lavender told him that he was no longer willing to hide or run. Lavender concluded, "Thats wa Im sayin Im goin out like scarface Word!!! ???? [sic]"

{¶45} The final series of messages, between Lavender and someone named Zyon, were being sent at about the same time as the messages between Lavender and Duke. Lavender began by also telling Zyon that people wanted him dead. He then told Zyon that someone had told him people were trying to find out where he was and trying to find out what "Shooter's" real name was. Zyon promised that, if anyone came after Lavender, they would all "get they head token off [sic]."[6]

{¶46} Having reviewed these messages, we cannot say that the trial court abused its discretion in allowing the admission of the text messages to show that Lavender was becoming increasingly desperate for money. While alternate arguments can be made as to why a teen would text in the manner that Lavender did, the state's theory of what the text messages represent is not wholly unsupported by the exhibits. The trial court considered this issue at length. It first considered the issue generally in a pretrial motion in limine relating to the texts. It then conducted a hearing on the issue the day before Detective Gehring was to testify about the exhibits. The trial court considered each of the messages in the 15 series and considered their progression. The trial court excluded some messages that had nothing to do with Lavender's need for money or feeling of despair. The trial court concluded that the state's theory could be supported by the messages presented, and

---

[6] The trial court allowed the jury to consider the messages in this paragraph for any purpose, not limiting them to a determination of motive or other Evid.R. 404(B) reasons. The trial court instructed the jury accordingly.

that it would be up to the jury to determine whether such an explanation was credible. And as a final gate-keeping measure, the trial court considered the exhibits a third time as each one was addressed by Gehring and admitted into evidence, sometimes holding sidebar conferences to discuss some of the exhibits.

{¶47} Having determined that the trial court did not abuse its discretion when it determined that the text messages were properly admitted for the purposes set forth in Evid.R. 404(B), we must now determine whether the trial court abused its discretion when it determined that the probative value of the exhibits was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury in violation of Evid.R. 403(A).

{¶48} When the texts were first discussed at trial, the trial court told the jury:

> The evidence that is now being introduced is received into the record for a limited purpose to show motive and intent. When you consider this evidence in your deliberations, you are not to use it for any other purpose, including to prove the character of an accused in order to show that the accused acted in conformity with that character.

{¶49} An instruction regarding the proper use of the text message evidence was given 20 times at various points during the course of the presentation of the messages to the jury.

{¶50} We conclude that the trial court, after having considered the problems presented with the content of the text messages, fashioned a procedure to minimize the danger that the jury would consider the evidence for improper purposes such that the decision that the admission of the messages did not violate Evid.R. 403(A) was not an abuse of discretion.

**Testimony about Hitmen**

{¶51} In this argument, Lavender claims that the trial court erred when it allowed Detective Gehring to testify as an expert witness on "how contract killings occur." For the reasons set forth more fully in our analysis of Lavender's third assignment of error relating to "expert" testimony of police officers, we conclude that this testimony was properly admitted lay option testimony pursuant to Evid.R. 701. *See, e.g.*, *State v. Johnson*, 7th Dist. Jefferson No. 13JE5, 2014-Ohio-1226, ¶ 57 (detective's testimony as to gang activity was permissible under Evid.R. 701 based on detective's personal knowledge and experience in the field).

{¶52} We overrule Lavender's first assignment of error.

## Sufficiency and Weight of Evidence

{¶53} In his second assignment of error, Lavender claims that his conviction for aggravated murder was based upon insufficient evidence and was contrary to the manifest weight of the evidence. A challenge to the sufficiency of the evidence asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the crime proven beyond a reasonable doubt. *State v. Millikin*, 1st Dist. Hamilton Nos. C-030825 and C-030826, 2004-Ohio-4507, ¶ 15. Review of a weight-of-the-evidence challenge, however, requires examining the entire record, weighing all the evidence and reasonable inferences, and considering the credibility of the witnesses to determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way, resulting in a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶54} The state presented testimony from Coulter that he saw Lavender fleeing from the scene immediately after the shooting. While Lavender was running away, Coulter saw him wrap what appeared to be a small handgun in his shirt.

Coulter testified that he knew Lavender from the neighborhood. A composite sketch created from Coulter's account bore a striking resemblance to Lavender, and Coulter was able to pick Lavender's picture out from a photo array. Additionally, Johnson testified that he overheard a conversation in which Lavender claimed he was going to kill Lipscomb for money as part of a contract killing. Johnson also told police that he had seen Lavender with a small revolver. The fact that the police suspected that the weapon had been a small revolver was not public information, and Johnson had not been told this prior to his interview with detectives. Additionally, Lavender's history of text messages demonstrated that he was becoming both increasingly desperate for money and increasingly despondent in general. And then he told someone that he was about to pick up a body, and that soon his money troubles would be over. Within days of the shooting, Lavender's text conversations turned to thinking about purchasing a car.

{¶55} Admittedly, this was not a "slam-dunk" conviction. But, on this record, there was sufficient evidence to support the jury's verdict, and we cannot say that the jury lost its way when it convicted Lavender of aggravated murder or that his conviction was a manifest miscarriage of justice. We overrule Lavender's second assignment of error.

### Ineffective Assistance of Counsel

{¶56} In his third assignment of error, Lavender claims that his trial counsel was ineffective for several different reasons and that, as a result, he was denied a fair trial. We disagree.

{¶57} To prevail on an ineffective-assistance-of-counsel claim, Lavender must demonstrate that counsel's performance fell below an objective standard of reasonableness, and he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio

St.3d 136, 141-142, 538 N.E.2d 373 (1989). Counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 688; *Bradley* at 142. With regard to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* A reviewing court must indulge a presumption that counsel's behavior fell within the acceptable range of reasonable professional assistance. *Strickland* at 689; *Bradley* at 142. With regard to the second required finding, a defendant is only prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the complained-of conduct. *Strickland* at 694; *Bradley* at 142.

{¶58} Lavender claims that counsel was ineffective in 16 separate areas. We will address each in turn.

### Voir Dire

{¶59} Lavender first claims that trial counsel was ineffective for failing to pursue his challenge to the state's preemptory strike of a juror pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He claims that trial counsel erred when he withdrew the challenge "based on the fact that it was the first preemptory challenge." As this court has noted, "the existence of a pattern of discriminatory strikes is not a prerequisite to a prima facie case or to a finding of actual discrimination by the trial court." *State v. Walker*, 139 Ohio App.3d 52, 56, 742 N.E.2d 1173 (1st Dist.2000); *see State v. White*, 85 Ohio St.3d 433, 436, 709 N.E.2d 140 (1999).

{¶60} However, this case is distinguishable from *Walker*. In *Walker*, the only argument that the state raised relating to its decision to strike the African-American juror was that since he was the first African-American juror struck and since the state had struck a white juror before that, there had been no pattern established. *Walker* at 57. In this case, however, the state had valid race-neutral reasons for using one of its preemptory challenges. The prospective juror had indicated that she would have a difficult time following the law and weighing circumstantial evidence. The prospective juror also said that she would not be a good juror.

{¶61} In a case from the Second Appellate District, the court faced a claim that trial counsel had been ineffective for failing to timely issue *Batson* challenges to various witnesses. *State v. Robertson*, 90 Ohio App.3d 715, 720, 630 N.E.2d 422 (2d Dist.1993). In that case, trial counsel had waited until after the jury had been sworn before raising the issue. The court first determined that a prima facie case had been met as the jurors struck by the state were African-American. The court then went on to state that "[t]he only remaining question is whether a timely *Batson* challenge would have succeeded, i.e., was the *Batson* challenge meritorious."

{¶62} Engaging in the same analysis, we conclude that the challenge, while it would have been facially appropriate, would not have succeeded. The record demonstrates that the state had race-neutral reasons for striking the juror. Counsel, while incorrect in his understanding of how a *Batson* challenge is triggered, was not ineffective for failing to pursue it.

**Opening and Closing**

{¶63} Lavender next cites six instances during the opening remarks and closing arguments of the parties in which counsel was ineffective. We will address each issue in turn.

{¶64}   First, Lavender claims that counsel was ineffective for failing to object to the state's comment in opening that the case did not have to be perfect, and that 70 percent was okay.  He claims that this statement mischaracterizes the beyond-a-reasonable-doubt standard of proof.

{¶65}   During opening statements, the state began by explaining to the jury how a trial is like putting a puzzle together.  Since different witnesses have different information relevant to the case, each witness gives different pieces to the puzzle. The state then went on to say that:

> And, more importantly, if you keep that or you use that jigsaw puzzle reference in the back of your mind or in the back of your pocket, you're going to see with respect to the burden of proof that's imposed upon the State - - we talked yesterday about how the State doesn't have to be perfect, that the jigsaw puzzle - - you all know this from your experience.  As you start putting the puzzle together, if you don't know what it is, sometimes you can have 70 percent of the puzzle done and you know it's a picture of the Statue of Liberty.  You don't have the parts here of the sky, but you've got that.  Sometimes you need more, sometimes you need less to determine what it is.  And so as you listen to the evidence, it's important to keep that as a reference.

{¶66}   In the context of this opening statement, it is not necessarily the case that the state is talking about the burden of proof.  The analogy seems to be more about how you can tell what the picture is even when some of the pieces are missing. The rest of the opening statement talks about how there is no fingerprint evidence, there is no DNA evidence, there are no shell casings, etc.  But, even without that evidence, the state would present enough to support a conviction.

27

{**¶67**}   But even if the analogy were about proof beyond a reasonable doubt, the state's comments were not prejudicial.   We have previously addressed this exact issue in *State v. Jones*, 1st Dist. Hamilton No. C-160826, 2018-Ohio-1130, ¶ 14.   In *Jones*, this court held:

> Generally, "attempts to 'clarify' the term by example, analogy, metaphor, or simile are ill-advised." *State v. Turic*, 2d Dist. Greene No. 2010 CA 35, 2011-Ohio-3869, ¶ 13.   But as the Ohio Supreme Court stated when confronted with a different analogy, "While the prosecutor's comments were perhaps inappropriate, we do not find that the comments denigrated the reasonable doubt standard. Moreover, the trial court's 'reasonable-doubt instructions negated any misconception by the jury.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 78, quoting *State v. Lundgren*, 73 Ohio St.3d 474, 484, 653 N.E.2d 304 (1995).   Even the *Turic* court, which cautioned against the use of analogies to further explain reasonable doubt, found that the defendant had shown no prejudice because "the trial court instructed the jury that the court would set forth the law to be applied to the case, and it correctly defined reasonable doubt shortly after voir dire and in the concluding jury instructions." *Turic* at ¶ 14.

> In this case, the jury was given the proper definition of reasonable doubt in the jury instructions. In light of this proper instruction, the state's use of analogy—while ill-advised—did not denigrate the reasonable-doubt standard. And the comments did not rise to the level where it is clear that Jones would not have been convicted in their absence.

*Jones* at ¶ 14-15. The jury was properly instructed on the burden of proof in this case. Therefore, Lavender was not prejudiced by the statements made by the prosecutor in his opening statement. Counsel was not ineffective for failing to object.

{¶68} Second, Lavender claims that counsel was ineffective for failing to object to statements made by the prosecutor during his opening statement that Lavender's brother was a "hit man" and that killing people was the "family business." Additionally, the prosecutor made the comment that Lavender had the nickname "Shooter" because he shoots people. Lavender argues that the statements were "grossly prejudicial" and irrelevant to the case, and the failure to object cannot be excused as trial strategy.

{¶69} Toward the end of his opening statement, the prosecutor discussed the text messages that were going to be admitted and what they would demonstrate.

> MR. PREM: And you got to remember [sic], when you see these texts, when you see this evidence, this is a guy that really doesn't want to talk on the phone to somebody about why his name is Shooter. He's less guarded with his family.
>
> And he says, "It's a lifestyle I've chosen." His sister says at some point, "I don't want to lose you like we did our brother."
>
> And when you see that, at first glance you might think, wow, maybe the defendant's brother was killed. The defendant's brother wasn't killed. The evidence is going to tell you that when the sister and the defendant were talking about that, they're talking about his brother who was a hitman, his brother who used a small-caliber revolver - -
>
> MR. HARRIS: Judge, I'm going to object.
>
> THE COURT: Basis?

29

MR. HARRIS: His brother was a hitman and the evidence. It's speculation, Your Honor.

THE COURT: Well, I'm assuming you're getting to the point where you're going to establish that and connect it up.

Again, I'll remind you, ladies and gentlemen of the jury, opening statements are not evidence.

Please continue.

MR. PREM: The evidence is going to show it's a family business. This is what he does. This is how he was trained. This is what he thinks. As sad as it sounds, this is how he lived his life back in August of 2014 when he chose to take Mr. Lipscomb's life for money.

{¶70} The reference to Lavender's older brother as a hitman was important to the state to explain the text message from his sister in which she said that she did not want Lavender to wind up like he did. The state had evidence that Lavender's brother had been convicted of aggravated murder in a murder-for-hire scheme. This context gave particular meaning to the statement made by his sister that would have been lost on the jury otherwise. Additionally, references to Lavender as "Shooter" and the explanation therefore were important because it tied Lavender to the person that Johnson knew as Shooter, who was the one he overheard talking about his plan to kill Lipscomb for money. The offhand remark about murder being the family business, while hyperbolic and improper, was an isolated one and we cannot say that Lavender would not have been convicted without it. It was therefore not ineffective for counsel to fail to object.

{¶71} Third, Lavender claims that counsel was ineffective for failing to object to the state's closing argument in which it reviewed the text messages from the months prior to Lipscomb's death about robberies, the defendant's difficult life, and

selling drugs because, as Lavender argues, the state wanted the jury to "understand who the defendant is."

{¶72} We have discussed the text messages and the propriety of their usage at some length in the previous assignment of error, and the rationale for which the trial court allowed them to be used. Therefore, we address solely the comment that the prosecutor made to the jury that he wanted the jury to "understand who the defendant is." On the surface, it sounds like the state is attempting to use evidence of Lavender's character to prove that he acted in conformity therewith on August 4, 2014—in violation of Evid.R. 404(A).

{¶73} But examining the closing argument overall, we found no improper comment when considering the context. During closing argument, the prosecutor quoted a series of texts regarding his need for money and his desire not to rob someone who doesn't have any. The prosecutor then went on to say:

> Those two statements came in under this Evidence Rule 404B when the judge said they're admitted for a limited purpose. And I would agree with Mr. Harris; you cannot consider the fact that the defendant's talking about robbing somebody, the defendant's talking about his life is so miserable he's gonna sell drugs, you can't allow that to so infuriate you that you let your bias, sympathy or emotions swing toward me and you say if he does that he's got whatever coming to him. It's only for a limited purpose for you to **understand who the defendant is**.

(Emphasis added.) In context, the prosecutor was attempting to explain the exact opposite of what Lavender is claiming. The prosecutor properly explained that the jury could not consider the evidence for the purpose of deciding that he had acted in

31

conformity with the mentioned bad behavior. Reading the statement in context, that is clear. Counsel was not ineffective for failing to object on that basis.

{¶74} Fourth, Lavender claims that counsel was ineffective for failing to object to the comment made by the prosecutor during closing argument that "the information the defense relied on in presenting their case was provided to them through the police officers and not through the investigative work of the defense attorneys or investigator," as the state was trying to bolster its credibility.

{¶75} During closing argument, the state was discussing the testimony of Ramon Davis. During Davis's testimony, the state had elicited a response from Davis in which he admitted that he did not see anyone at the scene of the shooting when he went into the Port-O-Potty. The prosecutor then went on to say:

And the reason that's important is because when Mr. Harris was trying to tell you how he cracked this case by using Mr. Davis, Mr. Davis says - - wherever State's Exhibit 20A is. You're going to have it in the back and you listen to it. Don't take my word for it. He says - - he talks about: I was coming out of the Port-O-Potty and another woman here, she saw the guy running.

I asked him about that. I said: But then you made this statement - - I'm talking to Mr. Davis. It was another witness here that seen [sic] the man run.

\* \* \*

And his answer is Yeah.

\* \* \*

So the question is how do you think they got the 911 call [that Davis made]? How do you think they got the CAD report [that named Davis]? How do you think they got Mr. Davis's name?

Through this great investigator Jonathan Campbell? Or through these very same police officers that on a daily basis - - he doesn't get a bonus for getting the wrong guy convicted of a crime.

And, in fact, you got to see him testify. You got to see Detective Gehring testify. You got to see Howard Grant testify.

And I know Mr. Harris made a big deal about: These are professional witnesses, professional witnesses.

{¶76} One of the main prongs of the defense's theory of the case was that the state had conducted the investigation poorly. In particular, one of the major themes was that detectives ignored the information Davis had to offer and that they downplayed his significance. In this argument, the state was attempting to demonstrate that the investigators had not concealed the information Davis had to offer, nor had they completely ignored him. Lavender would not have had the information about Davis unless law enforcement had provided it. While the state may have been more spirited than would be preferable, both parties may be "colorful or creative" during closing argument, provided comments are supported by the evidence. *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). The state was permitted to address the allegation made in Lavender's closing argument as to the work of the detectives regarding Davis, and counsel was not ineffective for failing to object to his argument.

{¶77} Fifth, Lavender claims that counsel was ineffective for failing to object to comments made by the prosecutor that tended to denigrate defense counsel. Lavender claims that the prosecutor told the jury that defense counsel was "trying to manipulate witnesses into saying something untrue, taking a fact and twisting it, and asking questions of the witness that were unfair." He also claims that the state

"accused defense counsel of purposefully misleading the jury by not asking important, relevant questions of the witnesses.

{¶78}    During closing argument, the state was continuing to address the charges by Lavender's trial counsel about the detectives being "professional witnesses" and, in particular, being purposefully nonresponsive to his questions on cross-examination.   During his closing, defense counsel spent a great deal of time discussing this issue, at one point saying

> They've come to court specifically for this case.  They testify without notes, so they've either reviewed their notes and got prepared or they went over something, but they can't remember if the suspect gave them his phone with the pass code unlocked.  They can't recall that.  Do you believe that?  Or is that a professional witness testifying professionally?  I want you to think of how evasive these officers were when being asked questions.

{¶79}    In response to this particular attack on the state's case, the prosecutor responded:

> That's important because Mr. Harris brought up these police officers.   The one I remember is Grant, Howard Grant, who's a sergeant, a supervisor, been a homicide cop for a long time.  Has been in here before.  Has been under the gun before.  And he knows that a defense attorney can take a fact and twist it.  Can take something that's small and make it big.
>
> And so there was an exchange between Mr. Harris and Sergeant Grant.  Where Harris said:  Isn't it true that most witnesses don't want to cooperate with the cops?  Remember that?  And Grant didn't answer

at first. I forget, he equivocated in some way: I can't say that's true all the time.

And Mr. Harris: Isn't it true that most witnesses don't want to cooperate with the cops. And he did it two or three times. He tried to get the judge to get him to answer the question.

And then I interceded and said: Judge, he's trying to answer the question posed.

And then Mr. Harris changed the question slightly: Isn't it true that in that neighborhood, most people don't want to talk to the cops. And Sergeant Grant said: Well, yeah, that's true.

\* \* \*

So the question was not fair for what he was trying to do; and that is he's trying to - - and this isn't a bad thing; he's trying to put doubt in the case, he's trying to attack the case. That's his job. That's what he's supposed to do, but he's not a magician and he's stuck with the evidence that the police are able to get.

{¶80} The state's rebuttal closing was a direct response to defense counsel's assertion that the "professional witnesses" were being purposefully nonresponsive to his questions on cross-examination. The argument was appropriate, and defense counsel was not ineffective for failing to object to it.

{¶81} Finally, Lavender claims that counsel was ineffective for failing to object to the state's comments during closing argument that the prosecutor had told the witnesses to "tell the truth whether it helps me or hurts me," which represented the state's attempt to improperly bolster their credibility.

{¶82} Again, we find nothing improper for trial counsel to have objected to. During defense counsel's closing argument, counsel focused specifically on the two

witnesses who tied Lavender to the crime. First, counsel attacked Domingo Johnson. According to defense counsel, Johnson had every reason to lie on the stand to save himself. He was facing numerous felony-drug charges and was hoping to have them all dismissed. Similarly, counsel attacked the testimony of Dennis Coulter, the state's eyewitness. Because of his involvement in the case, Coulter and his family had been moved into witness protection. As a result of being in witness protection, their expenses were being paid by the government. Defense counsel implied that, as a result of the state paying his expenses, Coulter felt compelled to testify in a way that the state wanted him to.

{¶83} In response to this argument, the state said:

Remember what Dennis told you that I told him to do. I mean, I sat down with Dennis. In his testimony he said we sat down, we reviewed what I've said in the past.

I sat down with him and I said to him, like I said to Domingo: You got one job here. It's to tell the truth whether it helps me or helps him.

* * *

And I said [to Johnson]: what do you got to do to get my help?

Tell the truth whether it helps me or helps him.

Defense counsel had implied that there was an implicit quid pro quo that existed between the state and its two witnesses. The state was permitted, as it did, to negate that implicit attack by going over in closing the terms of the deals. The government's payment of Coulter's expenses while in witness protection was not conditioned on his testifying in any particular way. And Johnson's deal with the state relating to his pending charges was also not contingent on him testifying a certain way. This was a

proper argument for the state to make, and defense counsel was not ineffective for failing to object.

**Admission of Photographs**

{¶84}   Lavender next argues that counsel should have objected to the admission of three photographs depicting him flashing stacks of money on Facebook and a picture of him making a finger gun gesture to the camera.  The state argued that the pictures of cash were relevant because they were taken from Lavender's phone and, as Detective Gehring testified, murder-for-hire participants are usually paid in cash.  On appeal, Lavender argues that there was no legitimate trial strategy for allowing the pictures in.

{¶85}   One of trial counsel's strategies was to explain away the texts and social media evidence, as much as possible, by depicting it as the posturing of a teenager engaged in a segment of urban culture that finds such images and talk admirable.  During the cross-examination of Coulter, for example, counsel for Lavender questioned Coulter about the culture in some detail, even getting Coulter to admit that he, too, had posed for such pictures at one time even though Coulter thought of himself as a "positivity" rap artist.  The photos fed into that narrative, where they were not to be taken seriously, but rather to be seen as a poseur.  In light of this, it was not improper for trial counsel to fail to object to the admission of the photographs.

**Prosecutorial Misconduct – Leading Questions**

{¶86}   In addition to the above, Lavender makes several additional arguments relating to counsel's failure to object to portions of the proceedings that he claims represent prosecutorial misconduct.  In his first argument, Lavender claims that counsel should have objected to the state's use of leading questions on direct examination.

**{¶87}** We have examined the three instances cited by Lavender in their context. All three came from the questioning of a detective on areas of procedure about which trial counsel had presented evidence that the police work had been deficient. But these questions in no way coached the witness to give an answer that was untrue or that the witness would not have otherwise given. *See State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). This was not a situation, like this court has addressed previously, where the prosecutor had "essentially testified for the state's witnesses." *See State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 31. Trial counsel's failure to object to these isolated questions was not ineffective.

### Prosecutorial Misconduct – Bolstering Witness Credibility

**{¶88}** Next, Lavender claims that counsel was ineffective for failing to object to a series of questions presented to law enforcement witnesses designed to demonstrate that they had followed proper procedure. Lavender now argues that the state was improperly "bolstering" its case and improperly shoring up the credibility of its witnesses. But Lavender cites no legal rule that this violates, and he has made no reference to any legal authority that stands for the proposition that the state is not permitted to do so. Trial counsel placed the quality of the police work at issue in this case, and the state was permitted to respond to that by eliciting testimony about the quality of the police work. Trial counsel understood that he had placed that at issue, and therefore, did not object when this evidence was presented. And he was not ineffective for failing to do so.

### Prosecutorial Misconduct – Improper Expert Testimony

**{¶89}** Increasingly, this court is seeing cases in which criminal defendants are seeking reversals of their convictions based on the argument that members of law enforcement have offered testimony at trial as expert witnesses. The argument generally goes that, since the officer offered testimony beyond the scope of a lay

person, he is testifying as expert witness, but the state did not file a report pursuant to Crim.R. 16(K). And since that rule says that "[f]ailure to disclose the written report to opposing counsel **shall** preclude the expert's testimony at trial," the trial court erred when the testimony was allowed. (Emphasis added.) Crim.R. 16(K).

{¶90} While Lavender's argument is somewhat difficult to follow, he seems to first argue that Police Officer Grant improperly testified as a "quasi expert witness" on eyewitness identification. Grant was the officer who conducted the photo array with Coulter. The state asked him what he thought when Coulter first expressed that one individual looked like the suspect, and then said that another was the person he saw. Lavender also claims that Grant improperly testified as an expert witness on the issues relating to pretrial motions to suppress eyewitness identifications and the rules relating to the disclosure of exculpatory evidence. He also claims that Grant improperly testified as an expert witness on how homicide investigations are properly undertaken. Lavender further claims that Detective Gehring testified as an expert witness on the question of how discovery works in a criminal prosecution, how people in a high-crime neighborhood behave and speak, the use of burner phones and trap houses, the workings and identification of firearms, the proper implementation of a photo array for identification, and the usefulness of a composite sketch.

{¶91} Recently, this court has addressed the issue of police officers giving expert testimony based on their experience in law enforcement. In the first case, this court addressed the question of a police detective who testified as an "expert in investigating child abuse and neglect." *State v. Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985, ¶ 9. In that case, the state qualified the detective as an expert, the trial court recognized her as an expert, and the detective then testified to such issues as how children victimized by sexual assault typically behave, the

credibility of the complaining witnesses, and explanations for lack of physical evidence. This court concluded that the detective's opinions constituted expert opinions and that they fell under the requirements of Crim.R. 16(K). *Id.* at ¶ 20. We held that the testimony was not only improper, but that it was also crucial to the state obtaining a conviction. *Id.* at ¶ 25. This fact coupled with what this court found to be "pervasive prosecutorial misconduct during the closing arguments" resulted in the reversal of the conviction. *Id.* at ¶ 39.

**{¶92}** A few weeks later, this court returned to the issue when addressing a police officer who testified as an accident reconstructionist on the question of whether a defendant intentionally drove into a pedestrian. *State v. Benson*, 1st Dist. Hamilton No. C-180128, 2019-Ohio-3255. In that case, the parties conceded that the officer had testified as an expert witness, and the state had failed to submit a report pursuant to Crim.R. 16(K). *Id.* at ¶ 13. We held that the testimony violated the rule and that it also was improper because it was an opinion on an ultimate issue. *Id.* at ¶ 15. But this court went on to conclude that the error was harmless, because the other evidence favoring the conviction was "much more extensive and powerful" than it had been in *Hall*. *Id.* at ¶ 32.

**{¶93}** Most recently, this court has addressed the question of a police officer who testified as an expert witness on fingerprint analysis. *State v. Johnson*, 1st Dist. Hamilton No. C-170354, 2019-Ohio-3877. The witness testified that the fingerprint of the defendant matched that of ones found on certain evidence. The state claimed that the "evidence examination worksheet" that had been provided to the defendant constituted the expert report. *Id.* at ¶ 20. The witness testified to her specialized training, and the methodology she used when collecting and comparing the evidence. *Id.* at ¶ 21-23. We found that the defendant had not shown that the state had violated Crim.R. 16(K) because the "evidence examination worksheet" was not in the

40

record, and the defendant could not establish that it failed to meet the Crim.R. 16(K) requirements. *Id.* at ¶ 42.

{¶94} By its terms, Crim.R. 16(K) applies to "an expert witness for either side." In each of the above cases, there was no question that the witness was giving expert testimony such that the testimony fell within the parameters of Evid.R. 702 and, ultimately, Crim.R. 16(K). But if a witness is not testifying as an expert, Crim.R. 16(K) does not apply. *See, e.g., State v. Heller*, 9th Dist. Lorain No. 18CA011304, 2019-Ohio-4722, ¶ 10 (Crim.R. 16(K) does not apply to a case where a doctor is providing a lay opinion based on personal observation that an infant's injuries were not the result of an accident); *see also State v. Heineman*, 2016-Ohio-3058, 65 N.E.3d 287, ¶ 22 (8th Dist.). But within this recent line of jurisprudence, this court has not been called upon to address the question of when the testimony of a police officer becomes expert testimony because that factor was not in contention. The answer for our purposes lies somewhere between the interplay of Evid.R. 701 and 702.

{¶95} In 2001, the Ohio Supreme Court discussed the interplay between Evid.R. 701 and 702. *State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737 (2001). In that case, the court said:

It is consistent with this emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. The situation presented in this case fits into this classification. Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on

firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*Id.* at 296-297. The Twelfth Appellate District outlined the distinction between lay and expert opinion as

[a]n "expert witness" is defined as one who is "qualified by knowledge, skill, experience, training, or education to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue. * * * " *Black's Law Dictionary* (8th Ed.2004) 1633. In contrast, a "lay witness" is defined as one who does not testify as an expert and is restricted to "giving an opinion or making an inference that (1) is based on firsthand knowledge, and (2) is helpful in clarifying the testimony or in determining facts." *Id.*

*State v. Fread*, 12th Dist. Butler No. CA2013-03-045, 2013-Ohio-5206, ¶ 14. The distinction between lay and expert-witness opinion testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that only specialists in the field can master. *McKee* at 297, fn. 2.

{¶96} As this court has noted, police officers may offer lay opinion testimony under Evid.R. 701 if it is based on the officers' perceptions through experience. *State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 44 (1st Dist.), citing *State v. Martin*, 1st Dist. Hamilton No. C-150054, 2016-Ohio-802, ¶ 16. As another court noted, "[i]t is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701." *State v. Jones*, 2015-

Ohio-4116, 43 N.E.3d 833, ¶ 108 (2d Dist.), citing *State v. Tatum*, 10th Dist. Franklin No. 10AP-626, 2011-Ohio-907, ¶ 17.

{¶97} A number of courts have determined that a police officer's opinion testimony may be admissible to explain a fact at issue even when it is based on specialized knowledge. *See Smith* at ¶ 45 (officer testified that quantity of drugs recovered represented an amount intended for distribution rather than for personal use); *State v. Calhoun*, 8th Dist. Cuyahoga No. 105442, 2017-Ohio-8488, ¶ 36 (officer's testimony regarding cell phone image extraction admissible when it was based on his training and experience as a "certified mobile examiner"); *State v. Blair*, 2016-Ohio-2872, 63 N.E.3d 798, ¶ 96 (4th Dist.) (detectives properly gave opinion that an individual did not have the strength to beat the victim to death and did not exhibit the kind of wounds that administering such a beating would have created); *Tatum* at ¶ 17 (detective testified, based on his experience shooting, working at crime scenes and recovering spent casings, that a large-caliber weapon was involved in shooting); *State v. Meddock*, 2017-Ohio-4414, 93 N.E.3d 43, ¶ 21 (4th Dist.) (officer's testimony regarding the ingredients and equipment necessary to manufacture methamphetamine); *State v. Rardon*, 2018-Ohio-1935, 112 N.E.3d 380, ¶ 58 (5th Dist.) (testimony from officer regarding thousands of text messages from accused drug dealer to explain terminology); *State v. Johnson*, 7th Dist. Jefferson No. 13JE5, 2014-Ohio-1226, ¶ 57 (detective's testimony as to gang activity was permissible under Evid.R. 701 based on detective's personal knowledge and experience in the field); *State v. McClain*, 6th Dist. Lucas No. L-10-1088, 2012-Ohio-5264, ¶ 13 (detective's testimony that quantities of narcotics recovered during the execution of the search warrant suggested that they were for sale as opposed to personal use was admissible under Evid.R. 701 as lay person opinion testimony because his testimony was based on his training and experience).

{¶98} It is clear that Crim.R. 16(K) requires the admission of expert testimony before a report is required. We have discussed the distinctions between expert and lay opinion testimony. And we have also considered under what conditions members of law enforcement may offer lay opinions based on their experience and observations that may aid the trier of fact in understanding the other testimony. Now we turn to the testimony about which Lavender complains.

{¶99} At the time of trial, Sergeant Howard Grant had been a police officer for 17 years. He had been a supervisor in the Special Investigations Section investigating homicides for 10 months. Prior to that, he had supervised a number of other departments. His role was to supervise investigations, including management of a crime scene, the proper charges to be filed, and preparation of a case for trial. His main role in this case was related to the administration of the photo array to Coulter.

{¶100} Lavender first claims that Grant gave improper expert opinion on the validity of the photo array used in this case, and photo arrays in general. In rebuttal after Lavender's trial counsel's cross-examination, the state asked Grant

> Q: When Mr. Harris was asking you about this photo spread and you said are you asking me what my opinion of the lineup is and he didn't ask you that. Have you looked at the photographs of these individuals?
>
> A: Yes
>
> Q: Is there anything glaring of that sticks out to you as being obviously noticeable or that points to any one picture that a person should pick out?
>
> A: No.

This line of questioning does not call for an expert opinion, nor does it even rely on Grant's experience as a police officer. During cross-examination, trial counsel was trying to get Grant to admit that the photograph of Lavender was much different than the photographs of the other five subjects in the array. This was not expert testimony.

{¶101} Lavender next claims that the state elicited expert testimony from Grant regarding Coulter's certainty regarding the identification of Lavender in the array.

> Q: Okay. Would you consider that - - you said the number 4 thing, said it looks like him, but you didn't consider it necessarily an ID. What did you think about Mr. Coulter's statement about this individual?
>
> A: He believed that that person in Number 5 was the person that he saw commit the homicide.
>
> Q: Okay. Did you stop at that point?
>
> A: I did not stop.
>
> Q: What did you do?
>
> A. My normal protocol is to ask is there anything else you want to say about this. Once he gave me the additional information about Number 5 we moved on from it. Took that photograph, put it in my folder, turned it backward and I presented to him Number 6.

In this case, Grant administered the photo array one picture at a time. Coulter was shown each photograph and asked if he recognized the person depicted. When Grant reached Number 4, Coulter said that it looked a lot like the person he saw. When Grant moved on to Number 5, Coulter said that the person in that photograph was definitely the person he saw. Contrary to what Lavender has argued, this testimony

45

was not offered as an expert opinion on how Coulter performed in the identification process. Rather, it was a factual recounting of why Coulter would have seemingly said that two different people looked like the shooter. Regardless, the testimony was not expert testimony, nor again was it lay opinion testimony based on Grant's experience as a police officer.

{¶102} Lavender next complains that Grant gave expert opinion testimony on motions to suppress witness identification testimony. Lavender claims that the state then used that testimony later to suggest that a lineup is not suggestive if a court admits it into evidence. During Grant's testimony, the state asked

Q: And you know - - do you know as a police officer if a lineup is suggestive, unfair, doesn't comply with this Revised Code that he was talking about, what does the defense through his attorney do at that point.

A: They would file a motion to suppress that identification.

Q: And - -

MR. HARRIS: Objection, Your Honor.

THE COURT: Basis?

MR. HARRIS: We submit, Your Honor.

Q: What is that?

A: A motion to suppress would be a hearing that's done in front of the judge in the court where the defense attorney and defendant are there with the prosecutor and they argue whether that photo lineup was suggestive or inappropriate or unfair.

Q: And if it's determined that the lineup was suggestive or inappropriate or unfair what happens to the lineup?

A: It becomes inadmissible in that case.

46

Later, during the state's redirect examination, Grant was asked:

> Q: When Mr. Harris was asking you on cross about suggestive photographs and you said it's a court issue, what did you mean by that?
>
> A: What I meant by that it's for the Court to determine whether the lineup will be used further in court. If the Court determined that the lineup was not suggestive or suggestive, the Court will make the determination, not me as a detective.
>
> Q: So is there a process, to your knowledge, as a matter of law that allows a defendant who thinks a lineup is suggestive to challenge it in court?
>
> A: Yes, a suppression hearing.

This testimony represents Grant testifying to an area that would not be something within the knowledge of a lay person, and it was based on his experience as a police officer, having participated in photo arrays and having testified in court regarding them. But we do not agree with Lavender's characterization of the testimony as suggesting that if a court admits a lineup its nonsuggestive nature is established as a matter of law. The state never made that argument, and much of the testimony and argument regarding the photo array revolved around whether it was suggestive. So, clearly, the jury could not have been confused on whether that point had been established.

{¶103} The problem with this line of testimony was that it simply wasn't relevant. But even though it was not relevant, counsel was not ineffective for failing to object unless Lavender was prejudiced by that failure. In this case, the jury was given the photographs and they were able to determine if the photo array was so one-sided that picking Lavender from it was a foregone conclusion.

{¶104} As to Grant, Lavender finally argues that he gave improper expert opinion testimony about how homicide investigations are generally conducted and gave improper testimony relating to the discovery process. As to the first issue, this was proper lay opinion testimony under Evid.R. 701. One of the major thrusts of Lavender's defense at trial was that his arrest was the result of sloppy police work. The state was permitted to contradict that assertion by having Grant, a supervisor of homicide detectives, testify about the proper conduct of a homicide investigation.

{¶105} As to the discovery line of questioning, the state began by asking Grant if he knew what discovery was.

A: Discovery means all the information we use to charge a defendant will be turned over - - is to be turned over to the defendant's attorney for review.

Q: And is it your understanding as a police officer that we do that or furnish that to the defendant through his attorney prior to going to trial.

A: Yes.

Q: Now, have you ever heard the term or have you ever engaged in conversation with any prosecutor about evidence favorable to the defendant. Do you know what that is?

A: Say that again.

Q: Evidence favorable to the defendant?

A: Yes.

Q: What is that?

A: I mean, it is what it is in the statement; if we have evidence that is favorable to the defendant, we have to turn that over to the defense.

Q: Assume for the sake of this hypothetical question that you've got a homicide offense and you have an individual that you have evidence committed the crime and you have a witness that comes forward and says that person didn't do that, somebody else did it.

If that information is inconsistent with your theory of the case, is that something you disregard or is that something you furnish to the prosecutor, that this witness said that person didn't do it?

A: Ideally that information will be passed on to the prosecutor's office. You let them know what you have. I think the evidence will speak for your investigation, but you do pass that information.

Q: And then do you know what happens to that information with respect to the prosecutor and the defense attorney?

A: Not off the top - - I mean, I don't generally deal with that. That's more of a prosecutor situation how they handle that.

This testimony was elicited with regard to how the police handled the information that had been provided to them by Davis. The police did not believe that Davis had any useful information because he was first reluctant to talk at all, and when he did he repeated information that he had learned from another source. Counsel for Lavender relied heavily on the fact that the description given by Davis did not match Lavender and that the police had improperly disregarded him. The testimony given by Grant was designed to explain how such evidence is handled, and how defense counsel learned of the evidence and to dispel the implicit argument that the state had attempted to bury it. Unlike the testimony regarding the legal significance of a motion to suppress, this was simply testimony about how certain information is handled during the course of an investigation, based on Grant's experience, and was

49

helpful to the jury in that regard. Therefore, it fell within Evid.R. 701 and outside the scope of Crim.R. 16(K).

{¶106} We now turn to the argument that Detective Gehring provided improper expert opinion testimony. Lavender claims that Gehring gave improper expert opinion testimony on the question of how discovery works in a criminal prosecution, how people in a high-crime neighborhood behave and speak, the use of burner phones and trap houses, the workings and identification of firearms, the proper implementation of a photo array for identification, and the usefulness of a composite sketch.

{¶107} At the time of his trial testimony, Detective Gregory Gehring had been a police officer for a little over 20 years. He has been a homicide detective since 2006. He testified to his training in the police academy, his work as a district patrol officer, his work in the personal crimes unit, and his transfer to the homicide division. He also testified to his post-academy instruction.

{¶108} The questions that Gehring was asked about the discovery process were similar to those asked of Grant. We conclude that they were designed to assist the jury and properly admitted at trial.

{¶109} Next, Lavender claims that Gehring gave improper expert opinion testimony regarding how people in high-crime areas behave and how they speak, that Gehring improperly decoded slang for the jury, and the meaning of terms like "burner phones" and "trap houses." Gehring testified that, as a beat officer, he got to know the people in the neighborhoods and how they communicated. He testified that the "slang" is a form of language he frequently encounters at work. His involvement with homicides that were drug-related caused him to learn that vocabulary as well. This is all the type of experience that is appropriately relied upon

when giving a lay opinion pursuant to Evid.R. 701. Trial counsel's failure to object was not improper.

{¶110} Additionally, Gehring was properly permitted to testify as to how a firearm operates. Gehring had been a police officer for over 20 years and had fired a gun "thousands of times." Similarly, his experience with firearms would allow him to render an opinion as to whether a particular picture contained an image of a revolver.

{¶111} As to the appropriateness of the photo array, the state asked if the array was problematic for being too suggestive, "as a police officer with the years of experience that you have." He said that he did not have a problem with the array. But this series of questions was in response to questions asked of Gehring by defense counsel on cross-examination, where counsel tried to get Gehring to admit that since Lavender was the only individual in the array with a "chin strap" beard, the array was unduly suggestive. This was pure lay opinion testimony, and not necessarily related to his experience as a police officer. And, as we have indicated previously, the jury had the opportunity to review the array and reach its own conclusions. Trial counsel was not ineffective for failing to object on the basis that this was improper expert testimony.

{¶112} Finally, Gehring testified that the composite sketch looked a lot like Lavender, saying that "that's the closest composite sketch looking to a suspect that I can remember." This is opinion testimony in only its loosest sense. The statement was not being offered to literally establish that it was the best composite picture he had ever seen. Simply that the composite bore a remarkable resemblance to Lavender, a fact the jury could see for itself. The fact that Gehring had had a chance to see many more composite pictures than the average person does not mean that the

observation was any more informative. It was not opinion testimony, and trial counsel was correct not to object to it.

{¶113} In his brief, Lavender cites a series of other passages "for additional improper opinion testimony," but presents no argument as to them. We have reviewed them all and find that none were expert opinions which would have triggered Crim.R. 16(K).

{¶114} Having reviewed every instance cited by Lavender in which he claims that the state improperly offered expert opinion testimony, we find no instances where that was the case. We did hold that one section of testimony—relating to the role of a motion to suppress and its legal significance—was not relevant. But we further hold that counsel was not ineffective for failing to object because the issue was one the jury could determine on its own. And, nonetheless, the testimony was not improper because it was not expert opinion testimony.

### **Prosecutorial Misconduct – Hearsay Testimony**

{¶115} Lavender next argues that counsel was ineffective for failing to object to the prosecutor's misconduct through his use of hearsay testimony. We disagree.

{¶116} Lavender first claims that the prosecutor improperly elicited hearsay testimony from the witness who created the composite sketch based on the description given by Coulter. Lavender claims that the Ohio Supreme Court has not addressed the issue. But it has. The court said

> A drawing of an alleged assailant sketched by a police artist, a poster reproduction of that drawing, a 'mug shot' of the accused taken after arrest, and the testimony of police officers as to statements describing the accused made to them by a prosecuting witness, are admissible solely to indicate the process by which the accused was identified,

where that process is under attack, and to corroborate that identification.

*State v. Lancaster*, 25 Ohio St.2d 83, 267 N.E.2d 291 (1971), paragraph four of the syllabus. The testimony was admitted for the purpose of explaining how the image was produced. Therefore, trial counsel's failure to object was not ineffective assistance.

{¶117} Lavender then argues that trial counsel was ineffective for failing to object to the prosecutor soliciting hearsay testimony from officers who testified to what Coulter told them he saw the night of the shooting and what Johnson told them that he had heard. Examining the testimony, it does not seem that the testimony was elicited for a reason other than for the truth of the matter asserted. Had trial counsel objected, the objections might well have been sustained. But both Johnson and Coulter testified at trial, so the failure to object was not prejudicial. Additionally, the hearsay statements were isolated incidents in a two-week trial, and their impact as a result was minimal.

### **Prosecutorial Misconduct – Text Messages**

{¶118} Lavender claims that trial counsel was ineffective for failing to object to the state's use of unduly prejudicial social media and text messages. The state introduced the message, which we have previously reviewed, regarding when Lavender shot into a car. Additionally, there were references on Lavender's Facebook page where he referred to himself as "El Chapo." These kind of messages, as we have indicated previously, fed into trial counsel's narrative that all of these messages and posts were the product of a teenager just putting on the affectations of a street-wise tough guy, in keeping with the culture in which he was engaged. Whether that was the best strategy for counsel to adopt is a matter about which we need not speculate. "Debatable trial tactics generally do not constitute ineffective

53

assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

### Cross-Examination

{¶119} Next Lavender claims that trial counsel was ineffective for failing to effectively cross-examine the state's witnesses, particularly Detective Gehring. Lavender points to numerous instances in which he claims that Gehring's answers were unresponsive. Having reviewed the testimony, it is clear that Gehring and trial counsel engaged in some heated exchanges. But one of the cores of counsel's trial strategy was showing that the state's "professional witnesses" were actively hostile to the defense—interested only in seeing Lavender convicted and unwilling to consider other possibilities and vigorous in their defense of their theory of the case. This was an extremely compelling trial strategy that became a centerpiece of counsel's closing argument. And none of the "nonresponsive" answers were anything that the detectives had not testified to on direct examination. Counsel was not ineffective for choosing to take this approach.

### Cooperative Informant

{¶120} Lavender next argues that counsel was ineffective for failing to object to the testimony of Johnson, the cooperative witness. But he has provided no basis upon which trial counsel could have challenged Johnson's testimony. And this court addressed this issue in *State v. McCoy*, 1st Dist. Hamilton No. C-090599, 2010-Ohio-5810. In that case, the appellant argued that the trial court erred when it overruled his "combined pretrial motions for a reliability hearing and for the exclusion of the cooperating witnesses' testimony." The court noted that the test of witness credibility is cross-examination, and it rejected the suggestion that the testimony of a cooperating witness is unreliable as a matter of law. *Id.* at ¶ 20. If trial counsel had sought to prevent Johnson's testimony, he would have been

unsuccessful, and Lavender has not provided this court with a reason for us to reconsider our holding on the matter.

### Eyewitness Identification Expert Testimony

{¶121} Lavender next claims that trial counsel was ineffective for failing to object to the testimony of the state's "expert" witness on eyewitness identification for making equivocal statements about the reliability of the procedure. But this testimony was taken from the hearing before the trial court on Lavender's motion to suppress the identification. The jury was not privy to this testimony, and the Rules of Evidence do not apply to motions to suppress. *See State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 17. Trial counsel was not ineffective for failing to object.

### Sentencing Mitigation

{¶122} Lavender next claims that counsel was ineffective for failing to present effective mitigation evidence. He claims that trial counsel failed to effectively argue the favorable mitigating information about his past, and did not call any witnesses to speak on his behalf. Defense counsel's decision to call or not call a mitigation witness at sentencing is a matter of trial strategy; debatable trial tactics generally do not constitute ineffective assistance of counsel. *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 222. While Lavender pointed out that he had contact with several family members, even a cursory review of the record in this case would indicate that calling at least some of them would be a bad decision. And nothing in the record indicates that anyone Lavender listed would have been helpful to his case. Trial counsel made an argument based on the records presented to the trial court that, if accepted, would have resulted in a reduced sentence. The fact that the trial court did not agree does not mean that defense counsel was ineffective in the attempt.

**Cumulative Effect**

{¶123} Lavender finally argues that the cumulative effect of all the above referenced instances of ineffective assistance of counsel was such that, even if the singular instances do not represent reversable error, the weight of the total deficient performance does. After our review, the only arguable instance of ineffective assistance was when trial counsel failed to object to hearsay testimony from officers who testified to what Johnson and Coulter told them. Therefore, there is no cumulative effect to consider.

{¶124} For the reasons set forth above, we overrule Lavender's third assignment of error.

### Prosecutorial Misconduct

{¶125} In his fourth assignment of error, Lavender claims that he was denied his right to due process because of prosecutorial misconduct. The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 21, ¶ 45. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 110, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶126} Under this assignment of error, Lavender's entire argument is that "[t]his trial had numerous instances of prosecutorial misconduct. These are outlined in [the] first three assignments of error of this brief and incorporated by reference herein. The prosecutor's improper comments in closing arguments and the introduction of inadmissible evidence prejudiced the defendant's right to a fair trial." For the reasons set forth above, we overrule Lavender's fourth assignment of error.

**Sentencing**

**{¶127}** In his fifth assignment of error, Lavender claims that the trial court erred when it sentenced him to life without the possibility of parole. We disagree.

**{¶128}** This court will only modify or vacate a sentence under R.C. 2953.08(G)(2) if we find clearly and convincingly that either the record does not support the mandatory sentencing findings or the sentence is otherwise contrary to law. *State v. White*, 2013-Ohio-1325, 997 N.E.2d 629 (1st Dist.).

**{¶129}** In Ohio, when a juvenile faces the sentence of life without the possibility of parole, the trial court "in exercising its discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole." *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 1, citing *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

**{¶130}** Having reviewed the record, we conclude that the trial court expressly considered Lavender's youth at the time of the offense. In discussing this factor, the trial court noted that "the victim's youth is to be considered as a mitigating factor for purposes of sentencing with the expectation or understanding that the imposition of a life sentence without the possibility of parole is something not to be entered into lightly and that the Court needs to be aware of the possible Eighth Amendment ramifications * * *."

**{¶131}** Additionally, Lavender argues that the trial court did not give proper consideration to the various mitigating factors presented. But we cannot say what weight was given to the various evidence that the trial court considered, other than to say that the trial court clearly found that the aggravating factors outweighed the mitigating factors. As the Eighth Appellate District noted, "We cannot independently determine the weight given to each factor to arrive at a different sentencing

conclusion or attempt to divine what factors the trial court deemed more relevant in the absence of specific findings. The court, having considered what the law requires, rendered a sentence within the bounds of the law." *State v. Ongert*, 8th Dist. Cuyahoga No. 103208, 2016-Ohio-1543, ¶ 15. We overrule Lavender's fifth assignment of error.

### Eyewitness Identification

{¶132} In his sixth assignment of error, Lavender claims that the trial court erred when it allowed the testimony regarding Coulter's identification of Lavender from the photo array. He claims that the photo array was unduly suggestive, and that the identification was unreliable. We disagree.

{¶133} The photo array was administered by Detective Grant, who was a blind administrator. Grant completed and read the blind administrator form to Coulter. In addition to the photograph of Lavender, the photographs of five other individuals were placed in separate folders. Grant showed the photos to Coulter one at a time, gave him as much time as he needed to review them, and allowed him to make a determination as to whether the person in the photograph looked familiar. Grant recorded anything that Coulter said about the photographs. Grant did not give any verbal or nonverbal cues regarding any of the subjects and gave no indication to Coulter if he picked the person the police suspected. Coulter initially said that the person in the fourth photograph looked like the suspect, but when he saw the fifth photograph, he positively identified Lavender.

{¶134} Lavender claims that the photo array was unduly suggestive because his photo was the only one with a "chin strap" beard. But, his was not the only one with facial hair generally. And, further, Coulter was instructed at the time to place little weight on hair or facial hair, as that is a feature of a person's appearance that can be easily changed. This court has held that an array was not unduly suggestive

58

even when only the suspect had a curly hairstyle, where the images are otherwise similar. *See State v. Taylor*, 1st Dist. Hamilton No. C-020475, 2004-Ohio-1494.

{¶135} This court has independently reviewed the six images. While Lavender's photograph is the only one with a "chin strap" beard, others had facial hair and none of the images stood out remarkably. Neither the array itself nor the manner in which it was administered was unduly suggestive.

{¶136} We also reject the argument that the identification was improper because Coulter had positively identified someone other than Lavender before identifying him. When shown photo four, Coulter said that "that looks more like him." In saying that, Coulter was saying that photo four looked more like the perpetrator than the first three did. That was not a positive identification. So, when he got to the fifth photo and said "that looks exactly like him," that was Coulter's positive identification of Lavender. The trial court did not err when it allowed the testimony of the identification to be presented to the jury. We overrule his sixth assignment of error.

### Transfer to Adult Court

{¶137} In his seventh assignment of error, Lavender claims that the juvenile court erred when it determined, after conducting an amenability hearing, that Lavender's case should be transferred to the general division of the common pleas court for trial as an adult. But the trial court complied with the statutory requirements, and the record does not support the conclusion that the trial court abused its discretion.

{¶138} The determination of whether a child is amendable to rehabilitation such that justice requires the juvenile court to retain jurisdiction over a case is left to the sound discretion of the juvenile court. *State v. Amos*, 1st Dist. Hamilton No. C-150263, 2016-Ohio-1319, ¶ 38. "When determining whether a child is amenable to

treatment within the juvenile system, the juvenile court must consider the factors weighing in favor of and against transfer, as outlined in R.C. 2152.12(D) and 2152.12(E), as well as any other relevant factor." *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 14.

{¶139} R.C. 2152.12 is silent with regard to how a juvenile court should weigh the factors in R.C. 2152.12(D) and (E). Thus, the juvenile court has the discretion to determine how much weight should be accorded to any given factor. *See State v. Morgan*, 10th Dist. Franklin No. 13AP-620, 2014-Ohio-5661, ¶ 37. "As long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, [this court] cannot conclude that the trial court abused its discretion in deciding whether to transfer jurisdiction." *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.).

{¶140} The record indicates that the juvenile court considered the appropriate statutory factors and identified those it found to be significant. Of note was the physical harm caused, the use of a firearm, Lavender's maturity, and the safety of the community. The fact that the juvenile court noted, at one point, "five years in exchange for a life was insufficient" does not mean that the trial court did not apply the proper standard. This is especially true in light of the fact that the juvenile court expressly stated that it had. On this record, we cannot say that the trial court abused its discretion. We overrule Lavender's seventh assignment of error.

### Cumulative Error

{¶141} In his eighth assignment of error, Lavender argues that the cumulative effect of the errors outlined in the previous assignments of error require reversal. Pursuant to the doctrine of cumulative error, "a conviction will be reversed

when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal." *State v. Pyles*, 7th Dist. Mahoning No. 13 MA 22, 2015-Ohio-5594, ¶ 103, citing *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). However, the cumulative-error doctrine "does not apply to cases that are not marked by multiple instances of harmless error." *State v. Banks*, 10th Dist. Franklin No. 03AP-1286, 2005-Ohio-1943, ¶ 23, citing *Garner*. We have not found multiple instances of harmless error in this case. We overrule Lavender's eighth assignment of error.

### Conclusion

{¶142} Having considered and overruled all eight of Lavender's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**MYERS, J.,** concurs separately.
**BERGERON, J**. dissents.

**MYERS, J.**, concurring separately.

{¶143} I write separately because I believe there were some errors in the trial that need to be addressed. First, I agree with the dissent as to a few of the 15 series text messages. I would find that admission of the text messages stating that when Lavender was 14 he took two people's lives, and he had shot and robbed a lot of people, were not admissible under Evid.R. 404 and should have been excluded. And, had defense counsel not withdrawn his or her objection, I would also find inadmissible Lavender's text that he had shot into a car. But I find that in light of the other evidence produced at trial, and the instructions of the trial court, any error was harmless. In other words, the outcome would have been the same.

61

{¶144}   I also would find that counsel was deficient in not objecting to some of the prosecutor's statements, in particular, statements about the "family business" of being a hit man and comments that the text messages were used for a limited purpose—"to understand who the defendant is."  As to the latter, that is exactly what the statements could not be used for.  And for the same reason, I would find these comments by the prosecutor improper.  But again, considering all the evidence, Lavender cannot establish that he was prejudiced by this deficiency.

**BERGERON, J.**, dissenting.

{¶145}   I respectfully dissent and would find that the admission of state's Exhibit 16(A), the photograph with Mr. Lavender holding a gun aimed at the camera, and various texts in the state's Exhibit 15 (the series of texts messages), constitutes reversible error.  Ostensibly admitted under Evid.R. 404(B), to demonstrate motive and intent, admission of such evidence should be strictly construed against the state and conservatively applied by trial courts.  *State v. DeMarco*, 31 Ohio St.3d 191, 194, 509 N.E.2d 1256 (1987).  The evidence here was probative of neither motive nor intent, and should have never been presented to the jury.  And even if this evidence could survive scrutiny under Evid.R. 404(B), I would find that it fails an analysis under Evid.R. 403 given its lack of relevance and its corresponding prejudicial nature.  *See State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.  Because the trial court did not properly evaluate this evidence, it abused its discretion in such a manner that tainted the entire trial.

{¶146}   From the opening bell of this trial, the state endeavored to paint Mr. Lavender as an unsavory character.  Calling Mr. Lavender a "gangster," the state insisted that he was destined to become an assassin: "The evidence is going to show it's a family business.  This is what he does. This is how he was trained. This is what

62

he thinks."[7] The photograph, according to the state, "exhibit[s] who he is." Coupled with the text messages, these exhibits played a pivotal role in forging a damning portrait of Mr. Lavender in the jury's mind, unrelated to the charged offense.

A.

{¶147} The state's theory of the case was that Mr. Lavender, in his desperation for money, agreed to engage in a murder-for-hire plot that culminated in Mr. Lipscomb's death. The state posited that various text messages illuminated this monetary despair, which allegedly revealed an "escalating" need for cash. Admitted here to show motive and intent, this type of evidence must "be temporally and circumstantially connected to the operative facts of the offense alleged." *State v. Griffin*, 142 Ohio App.3d 65, 72, 753 N.E.2d 967 (1st Dist.2001). Spanning approximately four months, the messages disclose conversations ranging from asking family for money to attend a festival to discussing robberies (past and contemplated), drug dealing, and prior killings and/or shootings. Noticeably absent is any indication of Mr. Lavender's involvement in a lucrative teenage assassin enterprise. Far from constituting a timeline of desperation, the texts merely served to cast Mr. Lavender as a "bad actor," capable of committing other violent crimes and therefore likely to kill for money. *See State v. Hart*, 2018-Ohio-3272, 118 N.E.3d 454, ¶ 41 (8th Dist.), quoting *State v. Sargent*, 2015-Ohio-704, 29 N.E.3d 331, ¶ 31 (6th Dist.) (admission of other acts evidence erroneous despite limiting instruction, when other acts were " 'very similar to the charged offense or of an inflammatory nature.' "). The texts, with a mixture of teenage angst and perhaps braggadocio, chronicle a series of crimes allegedly committed or contemplated by Mr. Lavender:

---

[7] I also agree with Judge Myers regarding the ineffective assistance in failing to object to certain comments.

- April 2014 text where he admits to "sell[ing] heroin [and] weed" for money (in other words, he's a drug dealer);

- May 2014 text asking a friend if he knows anyone that Mr. Lavender could rob;

- June 2014 text related to a marijuana transaction;

- June 2014 text in which he admits that he "took a [] life befo[re]" and that he "tried to kill" additional people;

- June 2014 text discussing a potential robbery target;

- July 2014 text admitting that "when I was 14 I took two [peoples'] life's [sic]" and that he "shot" numerous people and "rob[b]ed" numerous others;

- July 2014 text regarding a robbery he committed at 14 involving a drug transaction; and

- July 2014 text regarding an aborted drug transaction in which he admitted to shooting nine times at a car.

None of these texts suggest Mr. Lavender's involvement in a murder-for-hire scheme, or give any inkling as to his "motive" or "intent" to perpetrate such an offense.[8]  Instead, these reflect admissions of past crimes (drug transactions, killings, and robberies) as well as contemplated crimes (robberies and drug-related).

{¶148}  Interspersed within these texts are various texts expressing a desire for money (such as asking for $25 to attend a "festival [i]n colerain" or bemoaning the fact that his cell service was about to be cut off).  The state's insistence that this all shows that he needs money is an overreach—many (if not most) criminal offenses

---

[8] If we engaged in a text-by-text review of each missive, I would probably find a handful of the texts closer in proximity to the shooting admissible.  But this would not alter my overall analysis, because those few texts are more than drowned out by the significance of the inadmissible ones.

are committed because someone wants money. Exploiting a defendant's poverty or desire for money as a justification to parade a variety of past and contemplated misdeeds before the jury runs roughshod over Evid.R. 404(B) and poses grave risks to the integrity of criminal trials. Regardless, even if the texts about money showed motive here, those texts could have been selectively presented to the jury without all of the concomitant criminal admissions. Take his admission in different texts that he killed and shot people previously—those texts have nothing to do with money, nothing to do with any murder-for-hire scheme, and nothing to do with the offense at hand (the texts predated the death of Mr. Lipscomb). They thus provided nothing useful to the jury other than serving as a vehicle to "prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). He's a heartless killer—so the theory goes—and that proves he killed here too. But Evid.R. 404(B) was designed to avoid exactly that.

{¶149} Dripping with prejudicial effect, the texts were also inadmissible (at the very least) under Evid.R. 403. Mr. Lavender stood trial charged with a contract killing, and the texts enabled the state to brandish evidence that he had engaged in a range of illegal behavior (particularly prior shootings and killings) unrelated to the death of Mr. Lipscomb. This is precisely the type of unfairly prejudicial evidence that Evid.R. 403(A) excludes because it " 'appeals to the jury's emotions rather than intellect' " and invites the jury to rely on an improper basis for its decision. *See State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001); *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89 (noting the danger of unfair prejudice refers to evidence which suggests a decision on an improper basis).

{¶150}   The majority quotes the state's justification for the texts as turning on a timing question: "at some point it switches.  In about June, it switches from trying to rob people to becoming a hitman."  But this is doubly misguided.  First, if June is the real lynchpin, then what justification exists to wade through all of the prior texts (including scores I have not summarized here)?  Second, and more importantly, it rests upon a serious mischaracterization—one can search the record in vain for any substantiation of that point.  Texts about acting as a hitman might well be admissible on this record, but the trouble is there aren't any.  The state jumped in with both feet on the hitman theory, but it can't bootstrap admissibility by conjuring up nonexistent evidence.

### B.

{¶151}   Similarly, the state successfully introduced the photograph depicting Mr. Lavender holding an object "consistent" with the shape of a revolver in his left hand.   Based on testimony from the police's informant, Mr. Johnson, that he overheard Mr. Lavender discussing the upcoming hit and saw him in possession a revolver, the state then hypothesized that a .22 caliber revolver must have been the murder weapon (despite never actually recovering any evidence beyond the caliber of the bullet).  In the state's calculus, the "gun" depicted in Mr. Lavender's left hand became vital because it *could* have used .22 caliber bullets*, could* have been a revolver, and which *could* have been the murder weapon.

{¶152}   In the same photograph, however, Mr. Lavender also stands, grim-faced, right arm outstretched, pointing an unrelated gun directly at the camera.  The alleged revolver in his left hand is barely perceptible, overshadowed by the much larger gun aimed at the camera.  Words really cannot do this exhibit justice, so I include it below:



{¶153} The prejudicial effect of this photograph needs little elaboration. At trial no one disputed that the gun (in fact a pellet gun) facing the camera was unrelated to the murder. Based on the attenuated nature of the photograph, the state's introduction of such unrelated weapons evidence merely portrayed Mr. Lavender "as a person of violent character who had acted in conformity with his propensity to kill[.]" *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 48; *compare State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 79 (8th Dist.) (admission of evidence that defendant carried a gun was error when alleged gun was never recovered and only speculation that a revolver was used in the killing) *with State v. Connally*, 10th Dist. Franklin No. 16AP-53, 2016-Ohio-7573, ¶ 30, 34 (admitted photographs highly relevant when gun matching description of the gun

used to commit the crime appeared, despite the fact that another unrelated gun appeared in the photo).

{¶154} If you asked the average person on the street what that photo depicts, they would probably leap to the state's conclusion—a "gangster"—and agree that that person needs to be locked away. Not blind to this point, the state assured the jury that this photo (and a couple of others) reveals "who he is." It is little wonder the state's zeal to highlight this picture to the jury, but Evid.R. 403 exists to avoid prejudicial scenarios such as what occurred here. Mr. Lavender should not be convicted because he looks the part, but rather because the evidence proves that he committed the offense beyond a reasonable doubt.

C.

{¶155} To be sure, as the majority points out, the trial court gave several limiting instructions. But there are two things wrong with this. First, as noted above, many of the worst texts had nothing to do with any motive or intent—they just confessed to awful crimes. Assuring the jury that the text is "being offered for the limited purpose to show motive and intent" (in the words of the trial court) would only hopelessly confuse the jury because it is probative of neither. Moreover, the inherently prejudicial nature of the photograph and text messages could not be cured by a limiting instruction, regardless of how many times it was incanted. *See State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 39 (noting that limiting instruction was insufficient to overcome the prejudice of the improperly admitted evidence); *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 50 (French, J., concurring in judgment only) (explaining that a limiting instruction does not guarantee admissibility when the danger of unfair prejudice substantially outweighs the evidence's probative value); 1980 Staff Note, Evid.R. 105

("[I]f there would be danger of unfair prejudice, evidence * * * should not be admitted even with a limiting instruction.").

{¶156}   Without the text messages and photograph, the remaining evidence was reduced to the eyewitness identification and the information provided by Mr. Johnson.  And each had credibility issues.  Mr. Coulter's description of Mr. Lavender varied substantially from Mr. Lavender's actual physical appearance.  Mr. Coulter described a perpetrator with blue eyes and standing approximately 5 feet 7 inches or 5 feet 8 inches tall; Mr. Lavender has brown eyes and stands over six feet tall.  And his description of the perpetrator's skin admittedly varied, as at times the perpetrator was light-skinned, dark-skinned, and brown-skinned.  Mr. Coulter also described observing the perpetrator from a "couple of feet" away, when pictures of the scene revealed the impossibility of that characterization.  As to Mr. Johnson's testimony, questions of bias were self-evident.  Testimony adduced at trial revealed that Mr. Johnson divulged the information regarding the identity of Mr. Lipscomb's killer only after his apprehension for suspected criminal activity, and for which no charges were ever filed.  Mr. Johnson also appeared to have quite a résumé of cooperating with the police in order to avoid charges or secure more lenient sentencing on his myriad outstanding charges.  In other words, he seemed like a professional snitch—always in the right place at the right time to overhear inculpatory remarks by others.

{¶157}   While the jury was free to weigh this testimony as they saw fit, the admission of the above evidence certainly reassured the jury that Mr. Lavender was a "bad actor" (or a "gangster," as the state posited) and interfered with the jury's ability to properly weigh the testimony from Messrs. Coulter and Johnson, ultimately allowing them to accord greater weight and credibility to the witness identification and informant. *See State v. Walls*, 2018-Ohio-329, 104 N.E.3d 280, ¶ 45 (6th Dist.) (improper admission of expert testimony inhibited jury's ability to properly weigh

the evidence). This danger of "a potential for prejudice with respect not only to the weighing of the evidence but also the creation in the jury's mind of an urge to punish for past acts" is precisely the justification for excluding such evidence. *Griffin*, 142 Ohio App.3d at 71, 753 N.E.2d 967. As we explained in *Hall*, where the improper evidence "likely colored the jury's ability to properly weigh the credibility of the witness[es]," we cannot have "confidence that the error did not impact the outcome." *State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 24-25; *see State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25-29 (appellate court must be convinced that the error was harmless beyond a reasonable doubt).

{¶158} And the error is amplified by the prosecution's trial strategy to paint Mr. Lavender as a violent criminal desperate to kill for money. *See Griffin* at 79 (magnitude of prosecution's use of other acts evidence amplified when "was not isolated within the context of the trial, but was part of what was manifestly a strategy to portray [the defendant] as an emotionally unstable person to be feared for his violent propensities"); *id.* at 85 ("[I]t would be disingenuous to suggest that the evidence against [the defendant] was so overwhelming that there was no reasonable possibility that the improperly admitted other-acts and character evidence did not contribute to [the defendant's] conviction."); *State v. Johnson*, 71 Ohio St.3d 332, 341, 643 N.E.2d 1098 (1994) (irrelevant and unduly prejudicial evidence "was not harmless error, especially in light of the weakness of the evidence in this case and the state's undue reliance on impermissible character evidence in its prosecution[.]").

{¶159} Therefore, I would find that the admission of the photograph and text messages constituted errors that cannot be dismissed as harmless. Before we send this defendant to prison for the rest of his life, I would afford him a new trial

70

limited to evidence probative of whether he committed the murder at hand and free from the taint of improper character evidence.  I respectfully dissent.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

